IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**KORAN CHAMBERS**

_____

_____

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional*<sub>07/15/2015/2016</sub>
*page with the full list of names.)*

**-against-**

**WINDY STYNES**

_____

_____

_____

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*

**Complaint for Violation of Civil
Rights**

(Non-Prisoner Complaint)

Case No. 25-cv-2524-NCM-JRC
_____

*(to be filled in by the Clerk's Office)*

Jury Trial:    ☒ Yes    ☐ No
                *(check one)*

## NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting
from public access to electronic court files. Under this rule, papers filed with the court should
*not* contain: an individual's full social security number or full birth date; the full name of a
person known to be a minor; or a complete financial account number. A filing may include
*only*: the last four digits of a social security number; the year of an individual's birth; a
minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an
application to proceed in *forma pauperis*.

I.      **The Parties to This Complaint**

A.      **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Koran Chambers |
| Street Address | 104-09 189th Street |
| City and County | Saint Albans, Queens |
| State and Zip Code | New York 11412 |
| Telephone Number | (718) 926-3606 |
| E-mail Address | |

B.      **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Windy Stynes |
| Job or Title (if known) | Deputy Clerk |
| Street Address | 45 Monroe Place |
| City and County | Brooklyn, Kings |
| State and Zip Code | New York 11201 |
| Telephone Number | (718) 722-6308 |
| E-mail Address (if known) | |

Defendant No. 2

    Name                 _____

    Job or Title
    (if known)

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address
    (if known)

Defendant No. 3

    Name

    Job or Title
    (if known)

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address
    (if known)

Defendant No. 4

    Name

    Job or Title
    (if known)

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address
    (if known)

II.    **Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☒    State or local officials (a § 1983 claim)

☐    Federal officials (a *Bivens* claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

First and Fourteenth Amendments guranteeing access to the courts and prohibiting states from abridging citizen privileges and immunities, denying due process, and denying equal protection of the laws.

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

To prevent me from submitting papers seeking En banc re-argument of my Petition for CPLR Art. 78 relief that was arbitrarily denied by a single Justice, Defendant refused to accept my papers for filing, insisting that I had to start a new proceeding by filing a new Petition, despite the Court's rules allowing for reargument and reconsideration within 30 days of a decision.

4

**III.    Statement of Claim**

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

Appellate Division of the Supreme Court, Second Department

45 Monroe Place
Brooklyn, NY 11201

B.    What date and approximate time did the events giving rise to your claim(s) occur?

May 1, 2025, at approximately 4:30 PM

C.    What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

I filed a petition for CPLR Article 78 relilef to prevent my New York State criminal proceeding in Queens County, under Indictment No. 73253/2022, from proceeding without jurisdiction, in that I was indicted in violation of CPL 100.05, CPL 180.10, and perjury. Following illegal Ex parte contact between the defendant and the AG's and DA's office, who failed to appear to oppose my request for an Order to Show Cause and TRO under Docket No. 2025-05020, my application was submitted to a single Justice, who refused to sign my proposed order. When I returned the next day or so with an application for reargument, the defendant refused to accept my application for filing by telling me that I had to file an entirely new petition, and thereby pay a second time in order for my reargument to be heard, despite the court's rules allowing for reargument and reconsideration within 30 day of a decision (see copy of  my reargument papers annexed hereto and made a part hereof).

**IV.    Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Severe mental and emotional trauma, pain and anguish resulting from being illegally denied access to the Court, so that my illegal criminal prosecution is being allowed to proceed and jeopordize my family structure and welbeing, and from being subjected to the defendant's malicious indifference to my statutory and  constitutional rights under due process of law providing for reargument and reconsideration of the court's arbitrary refusal to sign my proposed Order to Show Cause with TRO.

**V.    Relief**

State briefly what you want the court to do for you.   Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

I request that the Court award me $250 Million in compensatory and punative damages against the defendant in her individual and official capasities for severe menal and emotion pain, suffering and distress, and for engaging in a criminal conspiracy with the Queens District Attorney, the Attorney General of the State of New York, and the State Criminal Supreme Court Justice presiding over my illegal indictment under Queens County Indictment No. 73253/2022, which was filed in violation of Article 180 of the New York Criminal Procedure Law, and founded upon perjury committed by my arresting officer, resulting in a jurisdictional defective and illegal prosecution.

**VI.    Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

6

**A.**     **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   __May 2,___ , 20__25__

Signature of Plaintiff  _____

Printed Name of Plaintiff   __Koran Chambers_____

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------x
In the Matter of the Application of Koran Chambers,
For Relief Pursuant to Article 78 of the CPLR,

                              Petitioner,

      -against-

Hon. David J. Kirschner, Justice, Queens
County Criminal Supreme Court, and Melinda
Katz, Queens   County District Attorney,
                           Respondents.
-------------------------------------------------------------------x

**APPLICATION FOR RECON-
SIDERATION EN BANC OF
ORDER TO SHOW CAUSE
AND TRO**

**Appellate Division
Docket No. 2025-05020**

**Queens County
Ind. No. 73253/22**

SIRS:

       **PLEASE TAKE NOTICE**, that the petitioner, Koran Chambers, hereby moves this

Court, En banc, for reconsideration of the Order to Show Cause and Temporary Restraining

Order sought by the Petition for relief pursuant to subd. 2 of CPLR §7803, filed with the Court

on April 28, 2025, and was "Declined to Sign" by the Hon. William G. Ford, Associate Justice of

this Court (see copy attached hereto and made a part hereof), without any opposition by the

Respondents, who were given due notice of the time and place of the Petition's filing and made

no appearance, and submitted no written opposition, opposing the same, **without any**

**justification whatsoever in law or fact for denying the Order to Show Cause and**

**Temporary Restraining Order to enjoin Respondents from proceeding without**

**jurisdiction.**

       The Respondent not only lack subject matter jurisdiction, but lack jurisdiction in totality

because jurisdiction was not lawfully acquired pursuant to Article 180 of the Criminal Procedure

Law, which is imposed by Criminal Procedure Law (CPL) §100.05 as a jurisdictional

prerequisite to grand jury action.

While the petition argued pertinent facts of the underlying case, such as Petitioner's indictment being founded upon perjured testimony by the arresting officer, the law of the Petition rests upon the indictment being illegally obtained in violation of CPL §100.05, which clearly and unequivocally prohibits the commencement of grand jury action on charges filed with a local criminal, leaving no way for grand jury action to lawfully commence on such charges except by way of Article 180 of the Criminal Procedure Law requiring a preliminary hearing or waiver before a defendant can be held over for grand jury action.

As it appears, Associate Justice William G. Ford's declining to sign the Order to Show Cause with TRO was made without a sound basis in reason, and disregards relevant facts or circumstances, implying that the refusal was made without proper consideration or justification.

**WHEREFORE**, Petitioner seeks reconsideration En banc of the application for an Order to Show Cause with Temporary Restraining Order to commence the Article 78 proceeding seeking to enjoin the Respondents from proceeding with Petitioner criminal action without jurisdiction, in addition to such other and further relief the Court may deem just and proper.

Dated: Queens, New York
      May 1, 2024

                                        Respectfully submitted,

Sworn to before me this

day of _____ 2025

Notary Public

                                  Koran Chambers, Pro se
                                  104-09 189th Street
                                  Saint Albans, NY 11412
                                  Phone: (718) 926-3606

SYLVIA RUIZ
Notary Public - State of New York
NO. 01RU6172436
Qualified in Queens County
My Commission Expires

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------x
In the Matter of the Application of Koran Chambers,
For Relief Pursuant to Article 78 of the CPLR,

                                                    Petitioner,

    -against-

Hon. David J. Kirschner, Justice, Queens
County Criminal Supreme Court, and Melinda
Katz, Queens   County District Attorney,
                                                    Respondents.
-----------------------------------------------------------------x

**ORDER TO SHOW CAUSE
WITH TRO**

**Appellate Division
Docket No. _____**

**Queens County
Ind. No. 73253/22**

     **LET THE RESPONDENTS SHOW CAUSE** before this Court, to be held before the Appellate Division of the Supreme Court, Second Judicial Department, located at 45 Monroe Place, Brooklyn, New York 11201, the _____ day of _____ 2025, at 10 o'clock in the forenoon of that day, or as soon thereafter as Petitioner may be heard, why a judgment should not be entered pursuant to §7806 of the Civil Practice Law and Rules, enjoining the Respondents from proceeding with prosecution of the Petitioner under Queens County Indictment No. 73253-2022, and dismissing the same upon the grounds that Respondents  proceeded, are proceeding, and are about to proceed without or in excess of jurisdiction.

     **GOOD CAUSE THEREFORE HAVING BEEN SHOWN**, it is hereby

     **ORDERED** that pending the hearing of this order to show cause, the proceeding under Queens County Supreme Court Indictment No. 73253-2022, is hereby stayed; and it is further

     **ORDERED** that service of a copy of this Order to Show Cause and the papers upon which it is granted, by the Petitioner personally upon the respondents and the New York State Attorney General at 28 Liberty Street, New York, New York 10005, on or before the _____ day of _____ 2025, shall be deemed good and sufficient service thereof.

**ENTER**

_____
Associate Justices of the Appellate Division, 2nd Dept.

# ATTACHMENT



A 477—Request for App. Div. intervention, civil case,
RADI Form A, 2ed Dept., 22 NYCRR 670, 9-93

JULIUS BLUMBERG, INC.
PUBLISHER, NYC 10013

# Supreme Court of the State of New York
## Appellate Division : Second Judicial Department

# Form A - Request for Appellate Division Intervention - Civil
See § 670.3 of the rules of this court for directions on the use of this form (22 NYCRR 670.3).

**Case Title:** Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended.

**For Court of Original Instance**

In the Matter of the Application of Koran Chambers,

For a Judgment pursuant to Article 78 of the CPLR,

Petitioner,

- against -

Hon. David J. Kirschner, Justice, Queens County Criminal Supreme Court, and Melinda Katz, Queens County District Attorney,

Respondents.

Date Notice of Appeal Filed

**For Appellate Division**

RECEIVED

| Case Type | | Filing Type | |
|---|---|---|---|
| ☐ Civil Action | ☒ CPLR article 78 Proceeding | ☐ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ☐ Special Proceeding Other | ☐ Original Proceeding | ☐ CPLR 5704 Review |
| | ☐ Habeas Corpus Proceeding | | |

**Nature of Suit:** Check up to five of the following categories which best reflect the nature of the case.

| A. Administrative Review | D. Domestic Relations | F. Prisoners | I. Torts |
|---|---|---|---|
| ☐ 1 Freedom of Information Law | ☐ 1 Adoption | ☐ 1 Discipline | ☐ 1 Assault, Battery, False |
| ☐ 2 Human Rights | ☐ 2 Attorney's Fees | ☐ 2 Jail Time Calculation | Imprisonment |
| ☐ 3 Licenses | ☐ 3 Children - Support | ☐ 3 Parole | ☐ 2 Conversion |
| ☐ 4 Public Employment | ☐ 4 Children - Custody/Visitation | ☐ 4 Other | ☐ 3 Defamation |
| ☐ 5 Social Services | ☐ 5 Children - Terminate Parent- | | ☐ 4 Fraud |
| ☐ 6 Other | al Rights | **G. Real Property** | ☐ 5 Intentional Infliction of |
| | ☐ 6 Children - Abuse/Neglect | ☐ 1 Condemnation | Emotional Distress |
| **B. Business & Other Relationships** | ☐ 7 Children - JD/PINS | ☐ 2 Determine Title | ☐ 6 Interference with Contract |
| ☐ 1 Partnership/Joint Venture | ☐ 8 Equitable Distribution | ☐ 3 Easements | ☐ 7 Malicious Prosecution/ |
| ☐ 2 Business | ☐ 9 Exclusive Occupancy of | ☐ 4 Environmental | Abuse of Process |
| ☐ 3 Religious | Residence | ☐ 5 Liens | ☐ 8 Malpractice |
| ☐ 4 Not-for-Profit | ☐ 10 Expert's Fees | ☐ 6 Mortgages | ☐ 9 Negligence |
| ☐ 5 Other | ☐ 11 Maintenance/Alimony | ☐ 7 Partition | ☐ 10 Nuisance |
| | ☐ 12 Marital Status | ☐ 8 Rent | ☐ 11 Products Liability |
| **C. Contracts** | ☐ 13 Paternity | ☐ 9 Taxation | ☐ 12 Strict Liability |
| ☐ 1 Brokerage | ☐ 14 Spousal Support | ☐ 10 Zoning | ☐ 13 Trespass and/or Waste |
| ☐ 2 Commercial Paper | ☐ 15 Other | ☐ 11 Other | ☐ 14 Other |
| ☐ 3 Construction | | | |
| ☐ 4 Employment | **E. Miscellaneous** | **H. Statutory** | **J. Wills & Estates** |
| ☐ 5 Insurance | ☐ 1 Constructive Trust | ☐ 1 City of Mount Vernon | ☐ 1 Accounting |
| ☐ 6 Real Property | ☐ 2 Debtor & Creditor | Charter §§ 120, 127-f, or | ☐ 2 Discovery |
| ☐ 7 Sales | ☐ 3 Declaratory Judgment | 129 | ☐ 3 Probate/Administration |
| ☐ 8 Secured | ☐ 4 Election Law | ☐ 2 Eminent Domain Proced- | ☐ 4 Trusts |
| ☐ 9 Other | ☐ 5 Notice of Claim | ure Law § 207 | ☐ 5 Other |
| | ☐ 6 Other | ☐ 3 General Municipal Law | |
| | | § 712 | |
| | | ☐ 4 Labor Law § 220 | |
| | | ☐ 5 Public Service Law §§ 128 | |
| | | or 170 | |
| | | ☐ 6 Other | |

V2.0.060293

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
----------------------------------------------------------------x
In the Matter of the Application of Koran Chambers,
For Relief Pursuant to Article 78 of the CPLR,
                                         Petitioner,
        -against-

Hon. David J. Kirschner, Justice, Queens
County Criminal Supreme Court, and Melinda
Katz, Queens   County District Attorney,
                                         Respondents.
----------------------------------------------------------------x

FEE PAID

#12  0.0

**ORDER TO SHOW CAUSE
WITH TRO**

**Appellate Division
Docket No.** 2025 - 05070

**Queens County
Ind. No. 73253/22**

 

       Upon the annexed Emergency Affidavit and Verified Petition of Koran Chambers, sworn to the 26th day of April 2025, for injunctive relief against the respondents pursuant to subd. 2 of CPLR §7803, and due deliberation having been had thereon,

       **LET THE RESPONDENTS SHOW CAUSE** before this Court, to be held before the Appellate Division of the Supreme Court, Second Judicial Department, located at 45 Monroe Place, Brooklyn, New York 11201, the _____ day of _____ 2025, at 10 o'clock in the forenoon of that day, or as soon thereafter as Petitioner may be heard, why a judgment should not be entered pursuant to §7806 of the Civil Practice Law and Rules, enjoining the Respondents from proceeding with prosecution of the Petitioner under Queens County Indictment No. 73253-2022, and dismissing the same upon the grounds that Respondents  proceeded, are proceeding, and are about to proceed without or in excess of jurisdiction.

       **GOOD CAUSE THEREFORE HAVING BEEN SHOWN**, it is hereby

       **ORDERED** that pending the hearing of this order to show cause, the proceeding under Queens County Supreme Court Indictment No. 73253-2022, is hereby stayed; and it is further

       **ORDERED** that service of a copy of this Order to Show Cause and the papers upon which it is granted, by the Petitioner personally upon the respondents and the New York State Attorney General at 28 Liberty Street, New York, New York 10005, on or before the _____ day of _____ 2025, shall be deemed good and sufficient service thereof.

                  **ENTER**

APPELLATE DIVISION
SECOND DEPARTMENT

25 APR 28 AM 10: 36

RECEIVED

_____
                 J.S.C

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------------x
In the Matter of the Application of Koran Chambers,
For Relief Pursuant to Article 78 of the CPLR,
                              Petitioner,

      -against-

Hon. David J. Kirschner, Justice, Queens
County Criminal Supreme Court, and Melinda
Katz, Queens   County District Attorney,
                            Respondents.
-----------------------------------------------------------------------x

**AFFIDAVIT IN SUPPORT**

**Appellate Division**
**Docket No. _____**

**Queens County**
**Ind. No. 73253/22**

STATE OF NEW YORK)
               :ss:
COUNTY OF QUEENS )

       I, KORAN CHAMBERS, am the petitioner named in the above-captioned special

proceeding and hereby affirm the following to be true and correct under penalty of perjury,

except as to that stated upon information and belief, and that as to those matters, I believe them

to be true.

       1.     This affidavit is submitted in support of the Order to Show Cause and Temporary

Restraining Order sought by this application, upon the grounds that the Respondents have

proceeded, are proceeding, and are about to proceed without, and in excess of subject matter

jurisdiction as set forth in the accompanying Verified Petition.

       2.     Emergency relief is sought because Respondents are looking to proceed to trial in

excess of jurisdiction on April 30, 2025.

       3.     Respondents lack jurisdiction to prosecute me because I was indicted in violation

of CPL §100.05, which imposes a subject matter jurisdictional prerequisite to grand jury action

on cases originating in the local criminal courts pursuant to CPL §180.10, so that grand jury

action is prohibited in cases where a defendant has not been afforded a preliminary hearing, and

has not waived the right to have a preliminary hearing.

4.      On April 25, 2025, the Respondents were notified that I would be filing a Petition for Article 78 relief pursuant to the Civil Practice Law and Rules on April 28, 2025, at 11 AM.

5.      Respondents were notified by telephone calls to the Queens District Attorney's Office at (718) 286-6000, ADA Maxwell Piller, and to the New York Attorney General's Office at (212) 416-8610, telephone receptionist who recorded the information.

1.      Copies of the intended filing were also emailed to respondents at the following email addresses: New York Attorney General: NYSAG@ag.ny.gov; Queens County District Attorney: Info@queensda.org.

6.      The Petition submitted herewith presents a clear legal right to the Article 78 relief sought, in that my indictment is founded upon a lack of subject matter jurisdiction and perjury.

7.      An order to show cause and temporary restraining order are needed to prevent Respondents from proceeding to trial without subject matter jurisdiction on April 30, 2025.

**WHEREFORE**, it is respectfully requested that the Court issue both an Order to Show Casuse and Temporary Restraining Order to temporarily enjoin Respondent's from proceeding pending the hearing of said orders.

Dated: Queens, New York
       April 26, 2025

Sworn to before me this 26th

day of April , 2025

Notary Public

Koran Chambers
104-09 189th Street
Saint Albans, NY 11412
Tel. (718) 926-3606

ARTHUR G BROADBELT JR
Notary Public - State of New York
No. 01BR6051167
Qualified In Queens County
My Commission Expires Nov 20, 20 26

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------x
In the Matter of the Application of Koran Chambers,
For Relief Pursuant to Article 78 of the CPLR,

                             **Petitioner,**

      -against-

Hon. David J. Kirschner, Justice, Queens
County Criminal Supreme Court, and Melinda
Katz, Queens County District Attorney,

                          **Respondents.**
------------------------------------------------------------x

**ORDER TO SHOW CAUSE
WITH TRO**

**Appellate Division
Docket No.** 2025-05020

**Queens County
Ind. No. 73253/22**

Upon the annexed Emergency Affidavit and Verified Petition of Koran Chambers, sworn to the 26th day of April 2025, for injunctive relief against the respondents pursuant to subd. 2 of CPLR §7803, and due deliberation having been had thereon,

**LET THE RESPONDENTS SHOW CAUSE** before this Court, to be held before the Appellate Division of the Supreme Court, Second Judicial Department, located at 45 Monroe Place, Brooklyn, New York 11201, the _____ day of _____ 2025, at 10 o'clock in the forenoon of that day, or as soon thereafter as Petitioner may be heard, why a judgment should not be entered pursuant to §7806 of the Civil Practice Law and Rules, enjoining the Respondents from proceeding with prosecution of the Petitioner under Queens County Indictment No. 73253-2022, and dismissing the same upon the grounds that Respondents proceeded, are proceeding, and are about to proceed without or in excess of jurisdiction.

**GOOD CAUSE THEREFORE HAVING BEEN SHOWN**, it is hereby

**ORDERED** that pending the hearing of this order to show cause, the proceeding under Queens County Supreme Court Indictment No. 73253-2022, is hereby stayed; and it is further

**ORDERED** that service of a copy of this Order to Show Cause and the papers upon which it is granted by the Petitioner personally upon the respondents and the New York State Attorney General at 28 Liberty Street, New York, New York 10005, on or before the _____ day of _____ 2025, shall be deemed good and sufficient service thereof.

                     **ENTER**

RECEIVED
25 APR 28 AM 10: 36
APPELLATE DIVISION
SECOND DEPARTMENT

XXXXXXXXXXXXXXXXXXXXXXXX
               J.S.C

Page 1 of 12

Declined to Sign

Dated: Brooklyn, New York
      April 28, 2025

_____
Hon. William G. Ford
Associate Justice
Appellate Division: 2nd Department

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------x
In the Matter of the Application of Koran Chambers,
For Relief Pursuant to Article 78 of the CPLR,

                                  Petitioner,

     -against-

Hon. David J. Kirschner, Justice, Queens
County Criminal Supreme Court, and Melinda
Katz, Queens   County District Attorney,

                               Respondents.
-------------------------------------------------------------------x

**VERIFIED PETITION**

**Appellate Division
Docket No. _____**

**Queens County
Ind. No. 73253/22**

**TO: THE SUPREME COURT OF THE STATE OF NEW YORK
    APPELLATE DIVISION: SECOND JUDICIAL DEPARTMENT**

Greetings:

       The **Verified Petition** of Koran Chambers, dated April 26, 2025, for relief pursuant to

§7803, subd. 2 of Article 78 of the Civil Practice Law and Rules, respectfully shows:

       1.     This petition seeks a judgment pursuant to Article 78 of the Civil Practice Law

and Rules (CPLR), enjoining petitioner's criminal prosecution under Queens County Supreme

Court Indictment No. 73253/22, upon the grounds that the Respondents have proceeded, are

proceeding, and are about to proceed without, and in excess of subject matter jurisdiction,

requiring an injunction to prevent the Petitioner from being subjected to a completely illegal

criminal prosecution.

       2.     A prior application for the relief herein sought was made to this court upon

different facts that did not present clear entitlement to the relief sought. The instant petition,

however, presents both facts and law that so clearly establish want of jurisdiction and entitlement

to Article 78 relief that the instant petition must be granted if the integrity and respectability of

the judicial process is to be maintained.

## VENUE

       3.     Venue is conferred pursuant to CPLR 506(b)(1).

## PARTIES

4.      Koran Chambers, is the Petitioner herein who seeks to enjoin the illegal acts of the Respondents, and has a principal mailing address of 104-09 189th Street, Saint Albans, New York 11412.

5.      Respondent, Hon. David Kirschner, is a Justice of the Supreme Court of the State of New York, County of Queens, whose principal office is located at the Queens County Criminal Supreme Court Courthouse, located at 125-01 Queens Boulevard, Kew Gardens, New York 11415, and is the Justice presiding over the Petitioner's criminal proceeding without and in excess of subject matter jurisdiction.

6.      Respondent, Melinda Katz, is the District Attorney for Queens County, whose principal office located at 125-01 Queens Boulevard, Kew Gardens, New York 11415, and is the person prosecuting petitioner without and excess of subject matter jurisdiction.

## STATEMENT OF FACTS

7.      On October 19, 2022, at approximately 8:45 PM, the Petitioner's motor vehicle was illegally stopped by New York City Police Detectives, dressed in blue patrol uniforms, on 190th Street between Linden Boulevard and 116th Road, Saint Albans Queens, New York.

8.      Petitioner's motor vehicle was approached by said officers, and was addressed by the lead officer who came to be known as Police Officer Joseph Keegan of the 113th Precinct, Queens, New York, who asked Petitioner if he knew why he was pulled over, then asserted that the reason he stopped Petitioner "was for window tints." No other reason or justification for the stop was asserted by Officer Keegan, as revealed by the bodycam evidence recorded at the time and place of the stop (a certified transcription of the bodycam recorded by Officer Keegan is annexed hereto and made a part hereof as **Exhibit "A"**).

9.    After the traffic stop, Officer Keegan noticed that the front license plate on Petitioner's vehicle was missing, and thus was not stated as a reason in addition to window tints for stopping Petitioner's car.

10.    Officer Keegan proceeded to ask for Petitioner's license and registration, which lead to several verbal exchanges and Petitioner being asked to exit his vehicle and stand at the back of the car for safety reasons.

11.    Several more verbal exchanges occurred with Officer Keegan while he probed for criminal conduct and surmised that Petitioner was concealing a weapon in his pants, resulting in an illegal search of the Petitioner's person and the seizure of a firearm, which lead to Petitioner being placed under arrest.

12.    Petitioner was arraigned upon a felony complaint in Queens County Criminal Court on October 21, 2022, under Docket No. CR-026148-22QN, but (1) was not provided with a copy of the felony complaint; (2) was not informed of the charges against him, and (3) was not informed of his right to a preliminary hearing  to determine if there was sufficient evidence to hold him over for grand jury action, despite the Criminal Court being obligated under Criminal Procedure Law (CPL) §180.10 to inform the Petitioner of such right (a copy of Petitioner's arraignment transcript is annexed hereto and made a part hereof as **Exhibit "B"**).

13.    In violation of CPL Article 180, in that Petitioner never received a preliminary hearing and did not waive his statutory right to receive one, Petitioner's case was presented to a grand jury, before which Officer Keegan testified and committed perjury by falsely testifying that he stopped Petitioner's car because of window tints and a missing front license plate (a copy of Officer Keegan's Grand Jury testimony annexed hereto and made a part hereof as **Exhibit "C"**).

14.    Petitioner was not allowed to testify before the grand jury because his attorney waived his right to appear.

15.    Petitioner was subsequently indicted on two counts of Criminal Possession of a Weapon in the Second Degree; Criminal Possession of a Weapon in the Third Degree; Operating a Motor Vehicle with a Tinted Window, and Driving or Parking a Motor Vehicle Without Proper License Plates.

16.    After arraigning Petitioner on the indictment, a suppression hearing was held, but Petitioner's attorney failed to address the fact that Officer Keegan never established justification nor probable cause for the traffic stop, in that driving with window tints is not a crime nor a Vehicle and Traffic Law (VTL) violation. Rather, driving with window tints in excess of that permitted by law is what constitutes a violation of the VTL, providing grounds for a traffic citation, which Officer Keegan did not state as the reason for stopping Petitioner's vehicle. As recorded by the bodycam, Officer Keegan's precise words were "The reason I stopped you is for the window tints."

17.    Officer Keegan's testimony at a subsequent suppression hearing revealed that Officer Keegan, along with the detectives accompanying him, were not on routine patrol although dressed in patrol uniforms and driving a patrol car. Rather, they were assigned to anticrime duty searching for stolen cars and stolen license plates.

18.    In fact, Officer Keegan was not equipped with a tint meter to measure and establish window tints in excess of that permitted by law, nor was he in possession of a citation book to enable issuing traffic violations. The stopping of Petitioner's vehicle, therefore, was entirely pretextual, occurring only as a means to probe for criminal activity, and illegal, violating

Petitioner's fundamental rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## **LEGAL ARGUMENT**

19.    Subject matter jurisdiction is a nonwaivable jurisdictional prerequisite to a criminal prosecution (Matter of Shirley v. Schulman, 78 N.Y.2d 915 [1991]; People v. Alejandro, 70 N.Y.2d 133 [1987]; People v. Hall, 48 N.Y.2d 927 [1979]; People v. Case, 42 N.Y. 2d 98 [1977]; People v. Nicometi, 12 N.Y.2d 428 [1963]; People ex rel. Siegal v. Dros, 11 N.Y.2d 167 [1962]; People v. Scott, 3 N.Y.2d 148 [1957]; People v. Zambounis, 251 N.Y. 94 [1929]; People ex rel. Tweed v. Liscomb, 60 N.Y. 559 [1875]; People v. Ryan, 185 Misc.2d 477 [Dis. Ct. Suffolk Co. 2000]; Albrecht v. United States, 273 U.S. 1 [1927]).

20.    Under the former Code of Criminal Procedure, a Grand Jury had power to investigate and indict regardless of what had occurred before the magistrate and regardless of whether the magistrate had held or discharged the prisoner or still had the matter pending, or of whether there had ever been a preliminary hearing (People ex rel. Hirschberg v. Close, 1 N.Y.2d 258 [1956]0.

21.    However, under the current Criminal Procedure Law (CPL), and specifically CPL §100.05, Grand Juries are strictly prohibited from intervening in matters commenced in a local criminal court, which are governed by Article 180 of the CPL and mandates that a defendant receive a preliminary hearing, or execute a waiver thereof before a case can be held over for grand jury action.

22.    Accordingly, CPL §100.05 imposes a jurisdictional prerequisite to grand jury action over charges commenced by felony complaint in a local criminal court, and such

jurisdiction can be exercised only where a defendant is held over for grand jury action after receiving or waiving a preliminary hearing pursuant to Article 180 of the CPL.

23.     In the case at bar, not only did Petitioner not receive a preliminary hearing, nor waive his fundamental right to receive one, but Petitioner was not even informed of the right to have a preliminary hearing as required CPL §180.10. Consequently, the criminal court lacked jurisdiction to hold Petitioner over for grand jury action, and the grand jury and superior court were without jurisdiction to indict and receive for filing an indictment against the Petitioner, who had not received nor waived the right to a preliminary hearing.

24.     CPL §100.05 clearly and unequivocally mandates that "The only way in which a criminal action can be commenced in a superior court, other than a criminal action against a juvenile offender or adolescent offender is by the filing therewith by a grand jury of an indictment against a defendant <u>**who has never been held by a local criminal court for the action of such grand jury with respect to any charge contained in such indictment**</u>. <u>Otherwise, a criminal action can be commenced only in a local criminal court, by the filing therewith of a local criminal court accusatory instrument,</u> namely: 1. An information; or 2. A simplified information; or 3. A prosecutor's information; or 4. A misdemeanor complaint; or 5. A felony complaint" (emphasis supplied). Thus, grand jury and superior court jurisdiction over criminal actions commenced in a local criminal court can occur only by the procedural requirements imposed by Article 180 of the CPL.

25.     Consequently, Respondents have proceeded, are proceeding, and will continue to proceed in excess of subject matter jurisdiction under Queens County Indictment No. 73253/22 unless enjoined pursuant to CPLR §7806.

26.     Subdivision 2 of CPLR §7803 permits Article 78 relief to address whether a body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction (Matter of Garner v. Correctional Services, 10 N.Y.3d 358 [2008]; Matter of Holtzman v. Goldman, 71 N.Y.2d 564 [1988]; Matter of Rush v. Mordue, 68 N.Y.2d 348 [1986]; Matter of Dondi v. Jones, 40 N.Y.2d 8 [1976]).

27.     Realizing that felony charges can result in a substantial loss of liberty, the Legislature deemed it essential to provide for a hearing allowing immediate inquiry into the sufficiency of a felony complaint (CPL §180.10), and to rebut the evidence thereof (CPL §180.60), so that a defendant is not held over for grand jury action based upon falsification or fallacy, as occurred in the case at bar.

28.     Indeed, the felony complaint herein, filed with the local criminal court under Docket No. CR-026148-22QN, falsely alleges that Officer Keegan observed Petitioner driving a 2011 red Jaguar "with excessive window tints, and only a rear New York State License Plate and no front license plate." It goes on to falsely suggest that "an examination of the front passenger window with a Tint Meter showed that said window had a light transmittance of only twenty-six percent (26%) which is below the legal limit of seventy percent (70%)" occurred at the inception of the traffic stop, which did not occur (a copy of the felony complaint is annexed hereto and made a part hereof as **Exhibit "D"**).

29.     Had a preliminary hearing been held as mandated by Article 180 of the CPL, the bodycam footage would have revealed that the events of the stop did not occur as alleged in the felony complaint, and would have presented grounds for suppression of any 4th Amendment violations with dismissal of the case, as the complaint was narrated in a way to legitimize the illegal search and seizure performed by Officer Keegan (People v. Nektalo, 2024 Slip Op. 02357

(COA); <u>People v. Banks</u>, 85 N.Y.2d 558 [1995]; <u>People v. Woods</u>, 79 N.Y.2d 958 (1992); <u>People v. DeBour</u>, 40 N.Y.2d 210 [1976]).

30.    Indeed, bodycam footage of the arrest reveals that a Tint Meter reading did not occur at the inception of Petitioner's traffic stop, nor before Petitioner was subjected to an illegal arrest, but occurred in the Police Precinct Parking Lot after Petitioner was taken into custody.

31.    Moreover, even if Petitioner's car window had been excessively tinted in violation of VTL §375(12-a), such a violation could not have been lawfully asserted unless Petitioner lacked a window tint exemption under Public Health Law §69-7.1, an inquiry Officer Keegan never made before subjecting Petitioner to what can only be described as a pretextual stop, the burden being on the accuser to show and establish a violation of the law. Absent a showing at the inception of the traffic stop that Petitioner was driving with illegally tinted windows, and was without a valid permit for same, Officer Keegan lacked lawful authority to detain, search and arrest Petitioner.

**WHEREFORE**, petitioner requests that an Order to Show Cause be issued with a Temporary Restraining Order enjoining the Respondents from proceeding with Petitioner's criminal case pending a hearing thereof, and requests that judgment be entered pursuant to CPLR §7806 permanently enjoining Petitioner's prosecution under Queens County Supreme Court Indictment No. 73253/22, and dismissing the indictment, in addition to such other and further relief as the Court may deem just and proper.

Dated:  Queens, New York
        April 26, 2025                          Respectfully submitted,


                                                Koran Chambers
                                                104-09 189th Street
                                                Saint Albans, NY 11412

## **VERIFICATION**

STATE OF NEW YORK)

                :SS.:

COUNTY OF QUEENS )

       I, Koran Chambers, being first duly sworn, hereby depose and say:  that I have read the

foregoing Verified Petition dated April 26, 2025 and know the contents thereof, and that the

same is true and correct to the best of my personal knowledge.

Dated: Queens, NY
       April 26, 2025

Sworn to before me this 26th

day of April, 2025

Notary Public

Koran Chambers, Petitioner *pro se*

ARTHUR G BROADBELT JR
Notary Public - State of New York
No. 01BR6051167
Qualified In Queens County
My Commission Expires Nov 20, 20 26



# EXHIBIT A

CRIMINAL SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

------------------------X
IN THE MATTER(S) OF:

THE PEOPLE OF THE STATE OF NEW YORK,

Indictment No.
73253-2022

        Vs.

KORAN CHAMBERS,

        Defendant.
------------------------X

October 19, 2022

Transcript of:  Police Body Cam of Car Stop
2022-10-19  44-27-0400 9AXON BODY 3

Digital Recording, Transcribed by:
        SONYA LEDANSKI HYDE

Veritext Legal Solutions
330 Old Country Road - Suite 300
Mineola, NY 11501

People of the State of New York / Chambers 10/19/2022        2
PROCEEDINGS

1                OFFICER JOSEPH KEEGAN:  Roll the window down
2       for us?
3                KORAN CHAMBERS:  No, it don't work.
4                OFFICER JOSEPH KEEGAN:  All right, just pop the
5       door, then?
6                KORAN CHAMBERS:  (Inaudible).
7                OFFICER JOSEPH KEEGAN:  How's it going, man?
8                KORAN CHAMBERS:  Good.
9                OFFICER JOSEPH KEEGAN:  Do you have your
10      driver's license and registration on you?  Where's it at?
11               KORAN CHAMBERS:  In the back.
12               OFFICER JOSEPH KEEGAN:  All right.  That's all
13      right.  You can bring it out.  The reason I stopped you
14      is for the window tints.
15               KORAN CHAMBERS:  For the window tints?
16               OFFICER JOSEPH KEEGAN:  Yeah.  You ever get
17      pulled over for that?
18               KORAN CHAMBERS:  (Inaudible).
19               OFFICER JOSEPH KEEGAN:  Say it again?
20               KORAN CHAMBERS:  I said, I got in the car.  It
21      had it like this.  I don't know how to get them off.
22               OFFICER JOSEPH KEEGAN:  All right, I got you.
23      What are you up to tonight?
24               KORAN CHAMBERS:  I'm (inaudible).
25               OFFICER JOSEPH KEEGAN:  Okay, where are you

1    coming from?

2                KORAN CHAMBERS:  (Inaudible).

3                OFFICER JOSEPH KEEGAN:  (Inaudible) house?

4                KORAN CHAMBERS:  Yeah.

5                OFFICER JOSEPH KEEGAN:  All right.  Do me a

6    favor, just hang out real quick, all right?  Yo, where's

7    the front plate at?

8                POLICE OFFICER 1:  (Inaudible)?

9                OFFICER JOSEPH KEEGAN:  Yeah.  Oh, you got it?

10               POLICE OFFICER 1:  It fell off, or -- okay, all

11   right, you got to get out of the car.

12               POLICE OFFICER 2:  Yeah, you got to get out of

13   the car.  (Inaudible).

14               POLICE OFFICER 3:  All right.  (Inaudible).

15               POLICE OFFICER 2:  What?

16               POLICE OFFICER 3:  (Inaudible).

17               POLICE OFFICER 2:  I got (inaudible).

18               OFFICER JOSEPH KEEGAN:  Yeah, you got to wait,

19   my man.

20               POLICE OFFICER 2:  I will do that.  (Inaudible)

21   good for your hair.  No, get rid of baldness.  Don't do

22   that.  My friend did that (inaudible) growing out so bad.

23               POLICE OFFICER 3:  (Inaudible).

24               POLICE OFFICER 2:  Where are you going from?

25   Where are you coming from?  (Inaudible)?  Okay,

People of the State of New York / Chambers 10/19/2022    4
PROCEEDINGS

1      (inaudible).  Yeah, no, we (inaudible).  We do

2      (inaudible) other guy, (inaudible) now, but (inaudible),

3      all right?  (Inaudible).  You got to do what you got to

4      do, (inaudible).

5              You got my buddy (inaudible).  He's rolling in

6      the money.  It's just automatic.  You're on the road

7      (inaudible), everything, it's good money.  It's dirty

8      work but it's clean money.  (Inaudible).

9              OFFICER JOSEPH KEEGAN:  Koran?  When was the

10     last time you got in trouble on this car?

11             KORAN CHAMBERS:  On this car?

12             OFFICER JOSEPH KEEGAN:  Yeah.

13             KORAN CHAMBERS:  Meaning what?

14             OFFICER JOSEPH KEEGAN:  Just in general.

15             KORAN CHAMBERS:  I mean --

16             OFFICER JOSEPH KEEGAN:  You got arrested while

17     driving this car.

18             KORAN CHAMBERS:  Arrested?

19             OFFICER JOSEPH KEEGAN:  Yeah.

20             KORAN CHAMBERS:  No.  Never arrested.

21             OFFICER JOSEPH KEEGAN:  Anyone else arrested

22     while driving this car?

23             KORAN CHAMBERS:  No.

24             OFFICER JOSEPH KEEGAN:  These plates?

25             KORAN CHAMBERS:  These plates?  No, I don't

People of the State of New York / Chambers 10/19/2022      5
                              PROCEEDINGS

 1      know.  This is my car.

 2                  OFFICER JOSEPH KEEGAN:  When did you get the

 3      car?

 4                  KORAN CHAMBERS:  This car, probably about a

 5      year now ago.

 6                  OFFICER JOSEPH KEEGAN:  Okay.  Yeah, I just see

 7      some arrests associated with the car.  That's why I'm

 8      asking you.

 9                  KORAN CHAMBERS:  What kind of arrests

10      (inaudible).

11                  OFFICER JOSEPH KEEGAN:  I'm asking you, because

12      they come off on here.  That's why I was just asking you.

13                  POLICE OFFICER 2:  When'd you buy the car?

14                  KORAN CHAMBERS:  I bought it a year ago.

15                  OFFICER JOSEPH KEEGAN:  All right.  Do you have

16      the registration for it?

17                  KORAN CHAMBERS:  Registration the window.  I

18      got the -- insurance ought to be (inaudible).

19                  OFFICER JOSEPH KEEGAN:  All right.  Do you want

20      to check for the insurance (inaudible)?  It's not in the

21      glove box?

22                  KORAN CHAMBERS:  No, no, no.

23                  OFFICER JOSEPH KEEGAN:  When'd you get a

24      ticket?

25                  KORAN CHAMBERS:  (Inaudible).

People of the State of New York / Chambers 10/19/2022          6
PROCEEDINGS

 1                    OFFICER JOSEPH KEEGAN:  Who wrote you that?

 2                    KORAN CHAMBERS:  (Inaudible).

 3                    OFFICER JOSEPH KEEGAN:  And what?

 4                    KORAN CHAMBERS:  (Inaudible).

 5                    OFFICER JOSEPH KEEGAN:  Okay, Koran, while

 6       you're looking for that, why don't you just step out?

 7                    KORAN CHAMBERS:  (Inaudible), I got the

 8       insurance right here, bro.

 9                    OFFICER JOSEPH KEEGAN:  That's fine.  You can

10       just step out.  I just want to talk to you real quick.

11                    KORAN CHAMBERS:  (Inaudible)?

12                    OFFICER JOSEPH KEEGAN:  Boss, just do me a

13       favor, just step out of the car.  I want to talk to you,

14       all right?  It's just -- for my safety, I want to

15       continue the traffic stop talking out here.

16                    KORAN CHAMBERS:  Why?

17                    POLICE OFFICER:  Yeah, it'll take two seconds,

18       come on.

19                    KORAN CHAMBERS:  Yeah, but why, though?

20                    OFFICER JOSEPH KEEGAN:  Boss man, on any car

21       stop, we're allowed you to step out of the vehicle just

22       for our safety, okay?  And if you don't have the

23       registration and all this stuff for the car and I have to

24       continue to -- continue the traffic stop, I'd rather --

25                    KORAN CHAMBERS:  -- in the window, Officer.

Veritext Legal Solutions
330 Old Country Road - Suite 300
Mineola, NY 11501

1          OFFICER JOSEPH KEEGAN:  I understand.

2          KORAN CHAMBERS:  And my insurance card is right

3    here, so what am I stepping out for?

4          OFFICER JOSEPH KEEGAN:  You don't have the

5    registration paperwork on you.  I understand the

6    registration's in the car, and I asked you before, when I

7    came up here.  I said, you know, you've got the tints on

8    the car.  You mentioned nothing about the tickets.  I

9    just want to talk to you outside the car, that's all.  It

10   shouldn't be a problem, bro.  You're going to be out here

11   -- you're going to be on your way in two seconds.  Is

12   there any issues going on?

13         KORAN CHAMBERS:  I'm -- no, there's not -- no

14   issues.  I'm just saying, I've been sitting right here

15   for mad long, bro.

16         OFFICER JOSEPH KEEGAN:  All right.

17         KORAN CHAMBERS:  Come on, man.

18         OFFICER JOSEPH KEEGAN:  We'll have you out of

19   here in two seconds, all right?  You got nothing on you?

20         KORAN CHAMBERS:  No.  What do you --

21         OFFICER JOSEPH KEEGAN:  Nothing man.  Just

22   talking to you, all right?  That's all.

23         POLICE OFFICER 2:  (Inaudible).

24         POLICE OFFICER 3:  Put yourself against the

25   bumper.  That's all we want.

1           OFFICER JOSEPH KEEGAN:  Okay, just keep your

2      hands out of your pocket.  (Inaudible) search you quick

3      or --

4           KORAN CHAMBERS:  Sir, I'm --

5           OFFICER JOSEPH KEEGAN:  Just keep your hands

6      out of your pockets while we're talking, okay?

7           KORAN CHAMBERS:  (Inaudible) search the car?

8           OFFICER JOSEPH KEEGAN:  No, no, I'm not

9      searching the car.  I'm just running the registration.

10     It's just safer for me to have you stand back here with

11     my partner while I'm doing that.

12          POLICE OFFICER 2:  He's going to make sure the

13     VIN number on the door matches the dashboard.

14          OFFICER JOSEPH KEEGAN:  That's it.

15          KORAN CHAMBERS:  All right.

16          POLICE OFFICER:  (Inaudible).

17          OFFICER JOSEPH KEEGAN:  It's no big deal.

18          POLICE OFFICER 2:  (Inaudible) -- I'm not

19     saying you, but we've had issues where w4e've done this

20     (inaudible).  All right?  You'll be out of here in two

21     seconds.  (Inaudible).  You got your (inaudible) yet or

22     not yet?

23          There's not (inaudible).  He's not looking in

24     your car.  Do you mind if he checks the car, make sure

25     there's no weapons or anything like that?  What was that?

```
1              OFFICER JOSEPH KEEGAN:  What'd he say,

2    (inaudible)?  Your answer, brother?

3              KORAN CHAMBERS:  What?

4              OFFICER JOSEPH KEEGAN:  Listen, the VIN's not

5    coming back right now when I searched it, all right?

6              KORAN CHAMBERS:  What do you mean, it's not

7    coming back?  What do you want me to do?  I don't --

8              POLICE OFFICER 2:  Is this plate your -- is

9    this plate legit?

10             KORAN CHAMBERS:  Yes, the car is registered

11   (inaudible).

12             OFFICER JOSEPH KEEGAN:  All right, let me

13   (inaudible) real quick on him.  Yeah, you want to just

14   keep working on that?

15             POLICE OFFICER 2:  Yeah.

16             OFFICER JOSEPH KEEGAN:  Let me just talk to you

17   real quick, all right?  We're being completely cordial

18   with you, right?

19             KORAN CHAMBERS:  Right.

20             OFFICER JOSEPH KEEGAN:  All right, I got no

21   reason to give you a hard time or anything --

22             POLICE OFFICER 2:  This window doesn't open,

23   right?  This window --

24             OFFICER JOSEPH KEEGAN:  Yeah, you said that

25   window doesn't open?
```

PROCEEDINGS

1           KORAN CHAMBERS:  No.

2           OFFICER JOSEPH KEEGAN:  All right.  My man.

3   Little things, indicators to me when I'm on a traffic

4   stop, you know, it can either raise my suspicion, lower

5   my suspicion, okay?  I'm being totally cordial with you,

6   calm right now.

7                Every little questions I ask you, little things

8   like in the beginning about why I pulled you over and

9   stuff like that, and you got tickets.  The only thing you

10  mention that to me right off the bat, that you got two

11  tickets for -- okay, Officer, I already got pulled over

12  today for no front plate.

13          KORAN CHAMBERS:  No, I didn't get pulled over.

14  That was when the car was parked.  Okay?

15          OFFICER JOSEPH KEEGAN:  That was parking

16  tickets?  Okay.  Either way, all right?  And then, I'm

17  trying to talk to you really nice.  I'm not, you know,

18  not being mean or anything like that.  I asked you to

19  step out of the car and you're kind of being a little

20  apprehensive with me, okay?

21                That's what's making us a little apprehensive,

22  a little -- more -- raises my suspicion a little, so I

23  asked you to step out of the car.  Now I'm talking to you

24  back here, and you seem very uneasy.  You're dripping

25  sweat right now, profusely, and it's cold out.

People of the State of New York / Chambers 10/19/2022    11
PROCEEDINGS

 1              KORAN CHAMBERS:  All right, (inaudible) you got
 2       the lights in my eyes (inaudible).
 3              OFFICER JOSEPH KEEGAN:  I hear you, man, but
 4       what's going on right now?  what's really going on?
 5              KORAN CHAMBERS:  Nothing going on, may.
 6              OFFICER JOSEPH KEEGAN:  All right.  Well,
 7       normal -- normally people won't be sweating when it's 40
 8       degrees out, 40-something degrees out.  It's a little
 9       chilly tonight.  And the VIN's not coming back right
10       away.
11              KORAN CHAMBERS:  Run the plate.  Does the plate
12       come to my name --
13              OFFICER JOSEPH KEEGAN:  Yeah, yeah, it does.
14       It does.  That's why I was trying to make sure
15       everything's legit, okay?
16              KORAN CHAMBERS:  All right.
17              OFFICER JOSEPH KEEGAN:  I'm going to ask you
18       one more time, do you mind if we search your car?  I can
19       -- like I said before, I could only search your car if
20       you give me consent.  That's why I'm asking you.
21              KORAN CHAMBERS:  No, (inaudible).
22              OFFICER JOSEPH KEEGAN:  Okay.
23              KORAN CHAMBERS:  (Inaudible).
24              OFFICER JOSEPH KEEGAN:  What's that?
25              KORAN CHAMBERS:  I (inaudible).

People of the State of New York / Chambers 10/19/2022     12
PROCEEDINGS

1         OFFICER JOSEPH KEEGAN:  Yes, it's going to be

2    two seconds and then I'll get you out of here, okay?

3         KORAN CHAMBERS:  Okay.

4         OFFICER JOSEPH KEEGAN:  Do you have the

5    license?

6         POLICE OFFICER 2:  Yeah, (inaudible).

7         POLICE OFFICER:  Yeah, (inaudible).

8         POLICE OFFICER 2:  It's good, it's good.  I got

9    it.  No, it came back.  The DMV's all jacked up, so

10   sometimes it (inaudible).  Sometimes, we've got to do it

11   two, three times.

12        OFFICER JOSEPH KEEGAN:  I'm trying to get the

13   client ID, but it's not coming up.  (Inaudible)?

14        POLICE OFFICER 2:  (Inaudible).

15        OFFICER JOSEPH KEEGAN:  Yeah, why don't you try

16   one more time?  I'm showing your license right now,

17   that's all.  All right?

18        POLICE OFFICER 2:  Do you have a license plate?

19        OFFICER JOSEPH KEEGAN:  That's all.  Mr.

20   Chambers, what's going on?

21        POLICE OFFICER 2:  If there's something you

22   need to tell us, now's the time.

23        OFFICER JOSEPH KEEGAN:  Yeah.  All right, I'm

24   trying to run your license right now, it's the last thing

25   I'm going to do, but I can't be sitting here and not

People of the State of New York / Chambers 10/19/2022   13
PROCEEDINGS

1      asking you questions while you're sweating profusely,

2      bro.  Keep it real with us, all right?

3                POLICE OFFICER 2:  You got something you're not

4      supposed to have?

5                KORAN CHAMBERS:  (Inaudible) shit, bro.

6                OFFICER JOSEPH KEEGAN:  All right, let me ask

7      you.  What's going on with your jeans down there, boss

8      man?  (Inaudible).  All right.

9                POLICE OFFICER:  (Inaudible).

10               OFFICER JOSEPH KEEGAN:  All right, all right.

11     All right, chill out, chill out.  We got it.  Don't

12     fucking reach.  Don't even move.  All right?

13               KORAN CHAMBERS:  (Inaudible) lights.

14               OFFICER JOSEPH KEEGAN:  You got him cuffed?

15     Get him cuffed first.

16               POLICE OFFICER:  I got him cuffed.

17               OFFICER JOSEPH KEEGAN:  Just get the hands

18     cuffed.  I got it.

19               KORAN CHAMBERS:  (Inaudible).

20               POLICE OFFICER:  (Inaudible).

21               OFFICER JOSEPH KEEGAN:  All right, yeah, we're

22     going to (inaudible).  Just don't move, all right?

23               KORAN CHAMBERS:  (Inaudible).

24               POLICE OFFICER:  (Inaudible)?

25               OFFICER JOSEPH KEEGAN:  Yeah, yeah, yeah.

People of the State of New York / Chambers 10/19/2022    14
PROCEEDINGS

1           POLICE OFFICER:  (Inaudible).

2           OFFICER JOSEPH KEEGAN:  (Inaudible).

3           POLICE OFFICER:  (Inaudible).

4           POLICE OFFICER:  That's why I asked you, man.

5     Just be honest.  Just be cool with us.  We're being

6     straight with you, haven't we?

7           KORAN CHAMBERS:  (Inaudible).

8           POLICE OFFICER:  All right, it's all good.

9     Relax.

10          OFFICER JOSEPH KEEGAN:  I got to unbutton these

11    pants.  I don't want to let go.

12          KORAN CHAMBERS:  (Inaudible).

13          OFFICER JOSEPH KEEGAN:  All right, bro.  It's

14    all --

15          KORAN CHAMBERS:  I'm good, bro.  I'm good, bro.

16          OFFICER JOSEPH KEEGAN:  Be careful.

17          POLICE OFFICER:  This is (inaudible).

18          OFFICER JOSEPH KEEGAN:  Yeah, give me a light,

19    give me a light, Joe, give me a light, (inaudible).

20          KORAN CHAMBERS:  (Inaudible).

21          POLICE OFFICER:  (Inaudible).

22          OFFICER JOSEPH KEEGAN:  Just (inaudible).

23          POLICE OFFICER 2:  Yeah, we're good.

24          KORAN CHAMBERS:  (Inaudible).

25          OFFICER JOSEPH KEEGAN:  Just (inaudible) him

PROCEEDINGS

```
 1      again, make sure there's nothing else.
 2              KORAN CHAMBERS:  (Inaudible) good, bro.
 3      (Inaudible) good.  (Inaudible).
 4              POLICE OFFICER 2:  No, you're good, you're
 5      good.
 6              POLICE OFFICER 3:  Yeah, yeah.
 7              KORAN CHAMBERS:  (Inaudible), bro.  I was doing
 8      good, bro.
 9              POLICE OFFICER 3:  It's not a big deal.
10              KORAN CHAMBERS:  I was doing mad good, bro.
11      (Inaudible).  I'm good, bro.  I was doing good, bro.
12              OFFICER JOSEPH KEEGAN:  He's cuffed good?
13              POLICE OFFICER 3:  Yeah.
14              KORAN CHAMBERS:  (Inaudible), bro.  I am good,
15      bro.
16              POLICE OFFICER 2:  It's not a big deal.
17              KORAN CHAMBERS:  It is, bro, it is, bro.
18      (Inaudible) bro, I ain't been in trouble in mad long,
19      bro.  I just --
20              POLICE OFFICER 3:  Hold this.
21              KORAN CHAMBERS:  Did all my fucking -- did
22      time, bro.  Now I got to do this time again, bro.  Time
23      again, bro.  Again, bro.  This is dumb shit, bro.
24              POLICE OFFICER 2:  You got anything else,
25      (inaudible) there?
```

People of the State of New York / Chambers 10/19/2022    16
PROCEEDINGS

1          KORAN CHAMBERS:  No, sir.  Bro, that's it, bro.
2    You all got it.
3          POLICE OFFICER 2:  That's it?
4          KORAN CHAMBERS:  That's it, brother.
5          OFFICER JOSEPH KEEGAN:  That's it?  You don't
6    have anything else on you?
7          KORAN CHAMBERS:  They got it, bro.  They got
8    it.  That's it.
9          POLICE OFFICER 3:  They're coming.  They're
10   coming (inaudible).
11         OFFICER JOSEPH KEEGAN:  Just wait for them to
12   get here and then we'll (inaudible).
13         POLICE OFFICER 2:  Couple (inaudible) division?
14         POLICE OFFICER 3:  Yeah, I got it.  I got it.
15   I got it.
16         POLICE OFFICER:  Just going to go over to
17   public safety.
18         OFFICER JOSEPH KEEGAN:  I mean, you don't even
19   got to -- oh, yeah.
20         POLICE OFFICER 2:  (Inaudible).
21         OFFICER JOSEPH KEEGAN:  All right.
22         POLICE OFFICER 2:  Just wherever you were going
23   to put that, they can work on it.
24         OFFICER JOSEPH KEEGAN:  Yeah.
25         KORAN CHAMBERS:  (Inaudible), bro.  Fuck.

People of the State of New York / Chambers 10/19/2022    17
PROCEEDINGS

1    Fucked my life up, just now, bro.

2                POLICE OFFICER 2:  (Inaudible).

3                KORAN CHAMBERS:  Fucked my life up.  It's just

4    not -- it's not all good, bro.  I just fucked my life up,

5    bro.  just fucked my life up, bro.  (Inaudible).  Oh man.

6    What am I looking at now, fellas?  What am I looking at

7    now?

8                POLICE OFFICER 2:  What's going to happen now?

9    We're taking you back to the precinct.

10               KORAN CHAMBERS:  How much time we looking at,

11   thought?

12               POLICE OFFICER 2:  Honestly?  I can't -- don't

13   --

14               OFFICER JOSEPH KEEGAN:  Yeah, we're not --

15               KORAN CHAMBERS:  I got --

16               OFFICER JOSEPH KEEGAN:  Don't even sweat that

17   right now.

18               POLICE OFFICER 2:  Don't even worry about that.

19               KORAN CHAMBERS:  I need to.  I got to start

20   thinking about my time.  I can't really --

21               POLICE OFFICER 2:  Yeah, I told them we need

22   transport.  So, they'll come.  They're going to bring it

23   back to the precinct and then we'll bring the car back,

24   too.

25               KORAN CHAMBERS:  Can't even fucking -- can't

```
 1    even play (inaudible).  I got to start thinking about
 2    time.
 3              POLICE OFFICER:  Listen.  Turn around.
 4              KORAN CHAMBERS:  I fucked up, bro.  I should've
 5    never had -- never been like this, bro.  Never been like
 6    this, bro.  I fucked up, bro.
 7              OFFICER JOSEPH KEEGAN:  I appreciate you being
 8    cooperative, though,  We appreciate that.
 9              POLICE OFFICER 2:  From this point forward,
10    listen, we treat you with respect, you treat us with
11    respect, and we're going to get -- we're going to make
12    this nice and easy, all right? All right, we'll get you
13    down to court, we'll get it all done.  You'll be out
14    tomorrow.  All right?
15              POLICE OFFICER:  Let's give him another toss
16    real quick, all right?
17              POLICE OFFICER 3:  Just give another toss.
18              OFFICER JOSEPH KEEGAN:  Can we get someone to
19    bring the car back?
20              POLICE OFFICER:  Yes.  They're coming.
21              POLICE OFFICER 2:  Turn around?  Just turn
22    right.
23              POLICE OFFICER:  It's all good.  It's all good.
24              POLICE OFFICER 2:  That have you been collared
25    for?  What's your last arrest for?  For this?
```

People of the State of New York / Chambers 10/19/2022    19
PROCEEDINGS

 1              KORAN CHAMBERS:  (Inaudible).

 2              POLICE OFFICER 2:  Only this?

 3              KORAN CHAMBERS:  No.

 4              POLICE OFFICER 2:  First one?  You'll be all

 5      right.  You'll be all right.  Listen, shit happens.  All

 6      right?  You'll be all right.

 7              OFFICER JOSEPH KEEGAN:  (Inaudible)?

 8              POLICE OFFICER 2:  He said two minutes.

 9              OFFICER JOSEPH KEEGAN:  All right.  Call

10      (inaudible).

11              POLICE OFFICER 2:  Yeah, well --

12              OFFICER JOSEPH KEEGAN:  (Inaudible) 13, right?

13              POLICE OFFICER 3:  Yeah?

14              POLICE OFFICER:  Yeah.

15              POLICE OFFICER:  Yeah.

16              POLICE OFFICER 2:  We want 113.

17              OFFICER JOSEPH KEEGAN:  (Inaudible) start

18      sweating.

19              KORAN CHAMBERS:  I just knew.  I just knew.  I

20      just knew.  I knew.  Soon as I seen you, I just knew.

21      (Inaudible).

22              OFFICER JOSEPH KEEGAN:  (Inaudible) that.

23              KORAN CHAMBERS:  I'm trying to move, bro.  I

24      swear to God, bro.  I've been trying to move, (inaudible)

25      and move, bro.  I want to be able to -- because the way I

People of the State of New York / Chambers 10/19/2022    20
PROCEEDINGS

1     live now --
2              POLICE OFFICER:  Where do you live?
3              KORAN CHAMBERS:  (Inaudible) I'm doing better
4     than these niggas out here and these fucking petty ass
5     fuckers out here, you feel me?  I want to be -- I want to
6     move.
7              POLICE OFFICER 2:  Make this it's your last --
8     make this your last --
9              KORAN CHAMBERS:  I want to move, bro.  I want
10    to be moved.  I want to have my own legit shit.  I don't
11    want to ever have to (inaudible) --
12             POLICE OFFICER:  So, do this.  Make this your
13    last day.
14             KORAN CHAMBERS:  -- I can't even -- I'm never -
15    - I'm never going to be able to do this.  I'm never going
16    to be able to get legit shit, man.
17             POLICE OFFICER 2:  It's all good.  (Inaudible)
18    stuff in your pocket?  These guys are going to bring you
19    back to the precinct for us.  We'll get you (inaudible),
20    all right?
21             POLICE OFFICER:  We'll meet you there with all
22    your stuff.  Just take everything out.
23             POLICE OFFICER 2:  Yeah.
24             OFFICER JOSEPH KEEGAN:  (Inaudible).  Got to
25    bring him back.  When I called, he was sweating.

People of the State of New York / Chambers 10/19/2022    22
PROCEEDINGS

1          POLICE OFFICER:  I don't know why I doubt you,
2     bro.
3          OFFICER JOSEPH KEEGAN:  Hey, what's going on,
4     man?  This is Officer Keegan from Queens Auto Larceny.
5     Not much.  I'm on 190 and Linden.  We got a (inaudible),
6     but we're heading back to 113 on this person.  Yeah.
7     (Inaudible).  No, (inaudible).  yeah, about -- yeah,
8     probably like, 15 minutes we'll be there.  Yeah.  Yeah,
9     we're with Auto Larceny.
10          POLICE OFFICER:  I'll just follow you.
11          POLICE OFFICER:  All right, you put it over,
12     right?
13          OFFICER JOSEPH KEEGAN:  Yeah, hello?  Yeah.
14     2991.  Just want to write that down?
15          POLICE OFFICER:  (Inaudible).
16          POLICE OFFICER:  29 -- they'll give it to you
17     when you get there.  2991.
18          POLICE OFFICER:  All right, I got it.
19          OFFICER JOSEPH KEEGAN:  All right, thanks.
20          POLICE OFFICER:  (Inaudible).
21          OFFICER JOSEPH KEEGAN:  What's up?
22          POLICE OFFICER:  (Inaudible).
23          OFFICER JOSEPH KEEGAN:  Yeah, I think so.
24          POLICE OFFICER:  They'll give it to you when
25     you get there.  We don't really need it now.

People of the State of New York / Chambers 10/19/2022    23
PROCEEDINGS

 1              POLICE OFFICER:  (Inaudible).

 2              OFFICER JOSEPH KEEGAN:  That guy was so -- I

 3      couldn't hear him (inaudible).  I think Sergeant Bower.

 4      I think so.

 5              POLICE OFFICER:  Was it in his pants?

 6      (Inaudible).

 7              OFFICER JOSEPH KEEGAN:  Yeah.  So, I'm -- yeah,

 8      I'm staying live.  You guys want to stay live until you

 9      get back or --

10              POLICE OFFICER:  Yeah, we just keep in on until

11      we get to the precinct.

12              OFFICER JOSEPH KEEGAN:  Yeah.

13              POLICE OFFICER:  Just so it shows that we're

14      transporting him.

15              OFFICER JOSEPH KEEGAN:  Yeah, so (inaudible).

16              POLICE OFFICER:  You're not planting it on him.

17              OFFICER JOSEPH KEEGAN:  Yeah.

18              POLICE OFFICER:  This fucking dude.

19      (Inaudible).  We'll see you soon.  Who's taking him?

20              OFFICER JOSEPH KEEGAN:  Me.

21              POLICE OFFICER:  Yeah, just go in, (inaudible).

22              OFFICER JOSEPH KEEGAN:  Okay.

23              POLICE OFFICER:  That's all you really need to

24      do right now.

25              OFFICER JOSEPH KEEGAN:  All right, cool.

People of the State of New York / Chambers 10/19/2022    24
PROCEEDINGS

1              POLICE OFFICER:  (Inaudible).  Joe (inaudible)
2       over here, too.  I mean -- yeah, Joe.
3              OFFICER JOSEPH KEEGAN:  Sorry (inaudible).  Do
4       you know if Murray (inaudible) or --
5              POLICE OFFICER:  What's that?
6              OFFICER JOSEPH KEEGAN:  Did you hear if Murray
7       got another time or --
8              POLICE OFFICER:  I don't know if anybody put it
9       over, but (inaudible).
10             POLICE OFFICER:  I didn't hear.
11             OFFICER JOSEPH KEEGAN:  Yeah, I think
12      (inaudible).
13             POLICE OFFICER:  That your work phone?
14             POLICE OFFICER:  (Inaudible).
15             OFFICER JOSEPH KEEGAN:  158280.  (Inaudible).
16      Thank you.
17             POLICE OFFICER:  I'm going to send you the CAD.
18      Just got to print it out.
19             OFFICER JOSEPH KEEGAN: All right, thanks.
20             POLICE OFFICER:  What's your email?
21             OFFICER JOSEPH KEEGAN:  It's Joseph.  J-O-S-E-
22      P-H.  Dot Keegan.  K-E-E-G-A-N.  At NYPD.org.
23             POLICE OFFICER:  You're not (inaudible), too?
24             OFFICER JOSEPH KEEGAN:  No.
25             POLICE OFFICER:  Throw (inaudible).  Keep it on

People of the State of New York / Chambers 10/19/2022    25
PROCEEDINGS

1      and then throw them (inaudible) in the car.

2                  OFFICER JOSEPH KEEGAN:  (Inaudible).

3                  POLICE OFFICER:  Yeah.

4                  OFFICER JOSEPH KEEGAN:  Until ACP gets here?

5                  POLICE OFFICER:  Yeah, we'll just put in a gun

6      locker and lock it with the cuffs until he gets here.

7                  OFFICER JOSEPH KEEGAN:  .380?

8                  POLICE OFFICER:  Joe, can you just grab --

9                  OFFICER JOSEPH KEEGAN:   What do you need?

10                  POLICE OFFICER:  (Inaudible).

11                  OFFICER JOSEPH KEEGAN:  Yeah, there's on in

12      there already.  Nothing really up here.  What this is,

13      key or something.

14                  POLICE OFFICER:  There's nothing in there.

15                  OFFICER JOSEPH KEEGAN:  Nothing in there?

16                  POLICE OFFICER:  Just lock it with your cuff.

17                  OFFICER JOSEPH KEEGAN:  (Inaudible).

18                  POLICE OFFICER:  Yeah.

19                  OFFICER JOSEPH KEEGAN:  Stand up.  Nothing

20      else?

21                  KORAN CHAMBERS:  No.  That's it.  No.

22                  OFFICER JOSEPH KEEGAN:  What's that?

23                  KORAN CHAMBERS:  (Inaudible).

24                  POLICE OFFICER:  What's your phone number, man?

25                  KORAN CHAMBERS:  718.

People of the State of New York / Chambers 10/19/2022    26
PROCEEDINGS

```
 1                POLICE OFFICER:  Yeah.

 2                KORAN CHAMBERS:  (Inaudible).

 3                POLICE OFFICER:  17824.  960.

 4                OFFICER JOSEPH KEEGAN:  I'm going to take this

 5      belt off.  You know how much money you have on you?

 6                KORAN CHAMBERS:  No.

 7                OFFICER JOSEPH KEEGAN:  (Inaudible)?

 8                KORAN CHAMBERS:  (Inaudible).

 9                OFFICER JOSEPH KEEGAN:  I'm just saying in

10      general, do you know (inaudible) or not?

11                KORAN CHAMBERS:  (Inaudible).

12                OFFICER JOSEPH KEEGAN:  Okay, I'm going to

13      (inaudible).  Do you have a lot of money on you?  Just in

14      general, do you know off the top of your head or not?

15                KORAN CHAMBERS:  (Inaudible).

16                OFFICER JOSEPH KEEGAN:  I'm going to count --

17      just have to count it and account for it.  You have any

18      other money on you?

19                KORAN CHAMBERS:  (Inaudible).

20                OFFICER JOSEPH KEEGAN:  Just one second.  Do

21      you need an ambulance?  No medical attention?  You good?

22      Spread your legs.  This way.  Same way.  You face me.

23      Just step over a little bit.

24                POLICE OFFICER:  555244.

25                POLICE OFFICER:  (Inaudible) the chain off.
```

People of the State of New York / Chambers 10/19/2022    27
PROCEEDINGS

1          OFFICER JOSEPH KEEGAN:  Yeah, I'll do it.  Just
2     hold onto the rest of this for me, please.  This come off
3     straight over your head?
4          KORAN CHAMBERS:  (Inaudible).
5          POLICE OFFICER 2:  It's got a latch in front.
6          OFFICER JOSEPH KEEGAN:  Oh, it does?
7          KORAN CHAMBERS:  It's really religious.  Not
8     supposed to (inaudible).
9          OFFICER JOSEPH KEEGAN:  (Inaudible).
10     Unfortunately, that's something you could use.  It's
11     going in the jewelry envelope, all right?  Okay.  Now, he
12     says he's got more than money in his pocket.
13          POLICE OFFICER:  Yeah, (inaudible).
14          POLICE OFFICER:  Okay.
15          POLICE OFFICER 2:  And this was all in the car
16     (inaudible).
17          OFFICER JOSEPH KEEGAN:  All the money that you
18     took off?  There any money in your wallet?  Money in your
19     phone or anything?  Have you step up here real quick, all
20     right?  Right there.
21          POLICE OFFICER:  (Inaudible).
22          OFFICER JOSEPH KEEGAN:  Just so you're on this
23     side.  I'm going to count it right now.  Denominations
24     out first.  20, 5, 10, 30, 31, 32, 33, 34, 35, 36, 37,
25     38.

Veritext Legal Solutions
330 Old Country Road - Suite 300
Mineola, NY 11501

People of the State of New York / Chambers, 10/19/2022     28
PROCEEDINGS

1                    POLICE OFFICER:  $38.  All right.

2                    OFFICER JOSEPH KEEGAN:  You have that?

3                    KORAN CHAMBERS:  You're giving it back?

4                    OFFICER JOSEPH KEEGAN:  Yeah, we're going to

5         give it back to you.  What pocket you want it in?

6                    POLICE OFFICER:  This is a different address,

7         just so you know.

8                    OFFICER JOSEPH KEEGAN:  Okay.  Thank you.

9                    POLICE OFFICER 2:  You got the keys?

10                   OFFICER JOSEPH KEEGAN:  (Inaudible).

11                   POLICE OFFICER:  Want me to hold it?

12                   OFFICER JOSEPH KEEGAN:  Yeah, if you don't

13        mind.

14                   OFFICER JOSEPH KEEGAN:  (Inaudible).

15                   POLICE OFFICER:  That's an extra bag.

16                   OFFICER JOSEPH KEEGAN:  You got keys?  Yeah.

17                   KORAN CHAMBERS:  (Inaudible) there?

18                   OFFICER JOSEPH KEEGAN:  Yeah, I can get you

19        one.  Why don't you grab a (inaudible) real quick?

20                   POLICE OFFICER:  Here it is.

21                   OFFICER JOSEPH KEEGAN:  we can grab it after.

22        (Inaudible).  Turn a little backwards.  Put your arm up.

23                   POLICE OFFICER 2:  (Inaudible) real quick.

24        (Inaudible) socks.  (Inaudible) just make sure you got

25        nothing in your socks.

People of the State of New York / Chambers 10/19/2022    29
PROCEEDINGS

 1              OFFICER JOSEPH KEEGAN:  (Inaudible).

 2              POLICE OFFICER:  All right.

 3              OFFICER JOSEPH KEEGAN:  Inside out.  Let me see

 4      the bottom of your foot quick.  All right.

 5              POLICE OFFICER :  Put it back on.

 6              KORAN CHAMBERS:  My foot's (inaudible).

 7              POLICE OFFICER:  You'd be surprised where the

 8      guys hide (inaudible).

 9              KORAN CHAMBERS:  (Inaudible).

10              POLICE OFFICER:  We'll put you in here quick.

11      I'll grab you a mask.  All right?  You good?

12              OFFICER JOSEPH KEEGAN:  Yeah.

13              POLICE OFFICER:  (Inaudible).

14              OFFICER JOSEPH KEEGAN:  Yeah, it should be

15      right on the desk.  (Inaudible).

16              KORAN CHAMBERS:  (Inaudible).  This is

17      (inaudible).

18              OFFICER JOSEPH KEEGAN:  All right.  Just take

19      that hoodie off real quick.  I just want to check it one

20      more time -- off you.

21              POLICE OFFICER:  You want something to eat,

22      man?  Water?  Food?

23              KORAN CHAMBERS:  No, just --

24              POLICE OFFICER:  We'll get you (inaudible).

25              KORAN CHAMBERS:  Yeah, (inaudible) --

People of the State of New York / Chambers, 10/19/2022      30
PROCEEDINGS

1          POLICE OFFICER:  Food, something?  Like I told

2     you on the street, you treat us good, we treat you good.

3     We'll (inaudible) soon, all right?

4          KORAN CHAMBERS:  I'll take a water.

5          POLICE OFFICER:  I'll get you water.

6     (Inaudible).  If you need something, shout.

7          KORAN CHAMBERS:  (Inaudible).

8          OFFICER JOSEPH KEEGAN:  Okay.  Just stand up

9     one more time for me to check you once more.  Face away

10    from me.  Spread your legs far as you can.  All right.

11         POLICE OFFICER:  Just hold on to the jacket --

12    you want to wear your jacket?

13         KORAN CHAMBERS:  Yeah.

14         POLICE OFFICER:  (Inaudible).

15         DETECTIVE LEVINE:  I'm Levine, this is Keegan.

16    All right?  I'm Levine.  This is Keegan.  If you need

17    something, shout.

18         KORAN CHAMBERS:  Levine?

19         DETECTIVE LEVINE:  I'm Levine, Detective

20    Levine.  This is Officer Keegan.

21         KORAN CHAMBERS:  And Keegan?

22         OFFICER JOSEPH KEEGAN:  Yeah, yeah.  We're your

23    AO, arresting officer, okay?

24         KORAN CHAMBERS:  (Inaudible).

25         POLICE OFFICER:  We'll get you water.

People of the State of New York / Chambers 10/19/2022          31
PROCEEDINGS

1                    (Proceedings Concluded)

2

3                    C E R T I F I C A T E

4

5     I, Sonya Ledanski Hyde, certify that the foregoing

6     transcript is a true and accurate record of the

7     proceedings.

8

9              Sonya M. Lelishi Hyde

10

11     _____

12

13     Veritext Legal Solutions

14     330 Old Country Road

15     Suite 300

16     Mineola, NY 11501

17

18     Date: April 24, 2025

19

20

21

22

23

24

# EXHIBIT B

```
 1   CRIMINAL COURT OF THE CITY OF NEW YORK

 2   COUNTY OF QUEENS:    PART AR3
     ----------------------------------------X
 3   THE PEOPLE OF THE STATE OF NEW YORK,   :
                                                   DOCKET NO.
 4              -against
                                            :  CR-026148-22QN
 5   KORAN CHAMBERS,
                                            :
 6              Defendant.
     ----------------------------------------X ARRAIGNMENT
 7
                          125-01 Queens Boulevard
 8                        Kew Gardens, New York 11415

 9                        October 21, 2022

10

11   B E F O R E:

12        THE HONORABLE WANDA LICITRA,
          Criminal Court Judge.
13

14

15   A P P E A R A N C E S:

16        MELINDA KATZ
          DISTRICT ATTORNEY - QUEENS COUNTY
17        BY:  KATHRYN INGLE, Esq.
          Assistant District Attorney
18

19
          THE LEGAL AID SOCIETY
20        Attorneys for Defendant
          120-46 Queens Boulevard
21        Queens, New York 11415
          BY:  DAVID BLONDELL, Esq.
22

23

24              DESREEN SINCLAIR
             OFFICIAL COURT REPORTER
25
```

ARRAIGNMENT

1   COURT OFFICER: Koran Chambers, docket ending 6148.

2   Defendant is charged with criminal possession of a weapon in

3   the second and various other charges.

4   Counsel, do you waive the reading but not the

5   rights thereunder?

6   MR. BLONDELL:  Yes.

7   THE COURT:  Good morning.

8   MS. INGLE:  People are serving Vienna Convention

9   Notice, 250.20 Notice, 710.30(1)(A) Statement Notice of a

10  statement made to Joseph Keegan on October 20, 2022 at 0130

11  hours at the precinct, in sum and substance:  I found the

12  gun in the grass before you pulled me over, oral statement,

13  190.55(A) Notice of the People's intent to present to the

14  grand jury on or by October 25, 2022, as well as, the

15  District Attorney's release of property in both English and

16  Spanish.

17  Regarding the securing order, the People are

18  asking for remand.  The defendant has predicate status,

19  three felony convictions, two of which are violent felony

20  convictions, one misdemeanor conviction, one failure to

21  appear, two YO adjudication, parol and probation revocation.

22  If bail is set in this matter, People are also requesting

23  electronic monitoring and a bail sufficiency hearing.

24  THE COURT:  What is the basis for that request?

25  MS. INGLE:  The defendant has three prior felony

ARRAIGNMENT

3

1   convictions, two of which are violent felonies.

2          THE COURT:  What is the predicate for the

3   sufficiency hearing?  What is the basis for that request?

4          MS. INGLE:  He has a history of burglary and drug

5   trafficking.  He was traveling around in a motor vehicle

6   with $16,000.00 and several thousand dollars worth of

7   merchandise with no legitimate source of income.  The

8   defendant was part of a group of individuals that were

9   breaking into people's homes and was arrested for two

10  incidents within a three-month period.  In these instances,

11  he fled from police once on foot and another time by car.

12  Earlier in June 20 --

13         THE COURT:  Are these open matters, Counselor?

14         MR. BLONDELL:  No, your Honor.

15         THE COURT:  Please be specific and let the Court

16  know what you are referencing because from my review of his

17  file, his last arrest was 2013.  So, please, when you are

18  referencing a record, please be specific about what you are

19  referencing and let the Court know what cycle you are on.

20         MS. INGLE:  In Cycle 4 in June 2012 the defendant

21  was observed in a fenced in area of another person's

22  property where he fled from police vehicle in that incident.

23  He pled guilty to possession of burglary tools in that

24  incident.  He has also violated parole and probation where

25  he committed additional crimes while under supervision.  He

ARRAIGNMENT

1  also admits that he was a part of the Mac Baller Gang which

2  is associated with 56 gun-related incidents including in

3  2012 where members were identified as shooters in shooting

4  homicide cases.   Three of their members were identified as

5  shooters where shots were fired and ten members were charged

6  with armed robberies.

7           THE COURT:  People, was this back in 2012?

8           MS. INGLE:  Yes.

9           THE COURT:  That he identified as a member of what

10  you just mentioned in 2012?  I just want to make sure what

11  you are talking about is over a decade ago.  I'm just not

12  sure if anything that you saying was referencing any current

13  information.

14           MS. INGLE:  I'm not sure when he admitted to that

15  but he has admitted in the past that he was part of the

16  gang.

17           THE COURT:  All right.

18           MS. INGLE:  The defendant also warranted at least

19  two times in the past.  In Cycle 4 he warranted on July 10,

20  2012 and came back to court on July 17, 2012.

21           THE COURT:  So, in 2012 there was a warrant for

22  five days?

23           MS. INGLE:  Yes.  He also fled from the police in

24  the past as well.

25           THE COURT:  When are you alleging that that

ARRAIGNMENT

1  happened?

2          MS. INGLE:  On January 10, 2013 he was observed by

3  police kicking the door to another person's garage to gain

4  entry when he and his accomplice fled climbing over fences

5  and running through backyards.  That was in Cycle 5.  On

6  April 18, 2013 just a week after posting bail on the April

7  11, 2013 arrest, in Cycle 5, he again was observed breaking

8  into someone's home.  In an attempt to avoid arrest, he sped

9  the vehicle, driving recklessly, ran red lights, speeding,

10  going around other vehicles and crossing into incoming

11  traffic posing serious risk of harm to others.

12          THE COURT:  And that was in 2013?

13          MS. INGLE:  Yes, Cycle 5.

14          THE COURT:  People, can you get to anything more

15  recent maybe in the last decade?

16          MS. INGLE:  That is all the information that I

17  have.

18          So, again, based on what was read before you, the

19  People are asking that you remand the defendant due to the

20  fact that he is a flight risk and his significant criminal

21  history.  Here, he is caught with a firearm and he faces

22  third-degree violent felony conviction within ten years.  He

23  has access to a large amount of cash and property acquired

24  by his criminal history more likely than any legitimate

25  employment he may now claim.  It is likely that members of

ARRAIGNMENT

6

1  his criminal organization may help post any monetary bail

2  for him so, remand is appropriate and in the event you do

3  set monetary bail, a bail sufficiency hearing is clearly

4  justified.

5            Nothing further, your Honor.

6            THE COURT:  Thank you.  I will hear you,

7  Counselor.

8            MR. BLONDELL:  Your Honor, ultimately I think it

9  would be ideal that he be released ROR.  Having said that,

10 given the severity of the charges, we are willing to consent

11 to Supervise Release and I would like to make a very

12 thorough application for my client.

13            First of all, the reason the People have nothing

14 to say about things that isn't a decade old is because

15 really we are talking about a different person now.  If you

16 look at the CJA report, he scores a 24 out of 25.  He's been

17 out of trouble since the 2013 event.  I don't know why the

18 allegation here is that he doesn't have adequate or real

19 employment.  He's been employed for five years.  He has a

20 well-paying job to the extent that there may be an issue

21 with his eligibility on a legitimate basis for my services.

22 But I am representing him until I get proof, I am fine

23 representing him but I am saying his job is legitimate.  He

24 has support here in the City of New York and has lived here

25 all his life.  He has a girlfriend here who came

ARRAIGNMENT

1    immediately, immediately upon the call that this has

2    happened.

3           You know, in terms of the charges here, your

4    Honor, I am prepared if your Honor is not convinced today to

5    give Supervise Release, I am prepared to give an abnormally

6    specific factual defense here if that would be helpful.

7           THE COURT:  I am at this time considering monetary

8    bail.

9           MR. BLONDELL:  Here is the deal.  We are prepared

10   to testify in the grand jury, I am handing it up to the

11   People now.  So, the statement notice here:  I found the gun

12   in the grass before you pulled me over is consistent with

13   what I believe is going to be a straightforward instance of

14   temporary lawful possession.  We are prepared and ready to

15   have the People take notes here.  Upon information and

16   belief, he found it in the grass and went back to his car

17   and he got on the road.  It was found around near my

18   client's girlfriend's home on 208th and 116th.  I plotted it

19   on Google Maps and I plotted to where it was found on 190th

20   and Linden.  He told me he was on his way to the 113th

21   Precinct.  Your Honor, please take notice that it is a

22   direct path.  The path is clarified on the map that he was

23   driving directly in the direction of the 113th Precinct.  I

24   also went online and reconfirmed that the Cash For Guns

25   Program is currently in effect and The New York City Police

ARRAIGNMENT

1    Department is encouraging people, if they have guns, to

2    bring them to the precinct to receive $200.00.  He is

3    absolutely certain and he will be testifying should the

4    People decide to bring this to the grand jury that he

5    intended to bring, he found a gun under lawful conditions,

6    to the NYPD as they direct citizens to do.  And then, for

7    the police officer to stop him on frankly, it's the classic

8    over-tinted windows, I think they are saying and missing the

9    front license plate, these are not reckless driving.  There

10   is no specific reason to believe that he was carrying out

11   any type of criminal behavior.  Its's unfair.

12          It's our position that the NYPD and the state and

13   the city can't have it both ways where they encourage people

14   to get guns off the street, tell them to bring them to the

15   precinct for money and then they stop them literally on

16   their way.  That seems profoundly unfair to me and I hoping

17   that all of that will be sufficient that Your Honor will be

18   willing, again, to do supervise release and if we absolutely

19   need to do electronic monitoring, we could do that if that

20   makes a difference for you.

21          THE COURT:  Is that it?

22          MR. BLONDELL:  That's it.

23          THE COURT:  After listening to the arguments of

24   both counsels, the Court does find that Mr. Chambers is

25   charged with a qualifying offense pursuant to CPL

ARRAIGNMENT

9

1   510.10(4).  I have made an individualized determination

2   pursuant to CPL 510.10(1) that Mr. Chambers does pose a risk

3   of flight to avoid prosecution.  In making that

4   determination I have carefully considered pursuant to CPL

5   510.30(1) the available information relevant for his return

6   to court including his past criminal convictions, and his

7   past parole revocation and I do find that he poses a risk of

8   flight to avoid prosecution and I do find that the least

9   restrictive condition that will reasonably ensure his return

10  to court is monetary bail.  I am not going to remand him as

11  requested by the People and I am not going to issue a

12  sufficiency hearing at this time.  The Court is going to set

13  -- Counsel, have you spoken to him about what his financial

14  circumstances are and his ability to post bail or to obtain

15  a surety bond?

16          MR. BLONDELL:  I have, your Honor.  If you are

17  able to set something in the $10,000.00/$20,000.00 bond

18  range, I think he might be able to make that.

19          THE COURT:  So, the Court will at this time set

20  $25,000.00 cash, over $25,000.00 insurance company bond over

21  $25,000.00 partially secured bond at ten percent.

22          MR. BLONDELL:  His 180.80 date is?

23          MS. INGLE:  The 25th.

24          MR. BLONDELL:  Thank you very much and we will be

25  testifying, obviously.

ARRAIGNMENT                                                          10

1          THE COURT:  This is going into GWP1 and that will

2    be for grand jury action and that is the 180.80 date on

3    October 25, 2022.

4          Mr. Chambers, if you do make bail, please make

5    sure to come back to court on October 25, 2022 that will be

6    when your grand jury presentation will be.  That is next

7    Tuesday.  Make sure that you are in court.  If you are not

8    court, a warrant could be issued for your arrest, the bail

9    could be forfeited and upon return, additional bail could be

10   set.

11         THE DEFENDANT:  Yes.

12         THE COURT:  We will see you on October 25, 2022.

13         COURT OFFICER:  Step in.

14                    *    *    *    *

15

16      C  E  R  T  I  F  I  C  A  T  I  O  N

17         It is hereby certified that the foregoing is a
     true and accurate transcript of the proceedings.
18

19

20   _____
         DESREEN SINCLAIR
21       Official Court Reporter

22

23

24

25

# EXHIBIT C

G.L.3

```
 1              POLICE OFFICER JOSEPH KEEGAN,
 2   SHIELD NUMBER 17824, Patrol Borough of Queens South, was
 3   called as a witness, having first been duly sworn,
 4   testified as follows:
 5   BY MR. PILLER:
 6      Q.   Officer, if you could, I'd like you to take the
 7   microphone off and just keep your voice up so we can all
 8   hear.
 9           I'd like to direct your attention to October 19,
10   2022, between 8:45 p.m. and 9:04 p.m.  Are you familiar
11   with that date and time?
12      A.   Yes.
13      Q.   Were you working on that date?
14      A.   Yes.
15      Q.   And on that date, what was your assignment?  What
16   were you doing?
17      A.   I was just patrolling.
18      Q.   Were you patrolling on foot or were you in a
19   vehicle?
20      A.   We were in a vehicle.
21      Q.   Were you with a partner, by yourself?
22      A.   I was with a partner, two partners.
23      Q.   And while you were patrolling, was your attention
24   drawn to anything?
25      A.   Yes.
```

G.L.4

1    Q.   What was your attention drawn to?

2    A.   There was a red Jaguar with window tints and no

3    front license plate.

4    Q.   And would excessively tinted and omitted front

5    license plate, would those be Vehicle and Traffic Law

6    infractions?

7    A.   Yes.

8    Q.   After you observed those infractions, what, if

9    anything, did you do?

10    A.   Turned on my emergency lights and conducted our

11    car stop on that vehicle.

12    Q.   Did the car stop?

13    A.   Yes.

14    Q.   What was the location of that traffic stop?

15    A.   It was 190th Street and Linden Boulevard.

16    Q.   Is that in Queens County, New York?

17    A.   Yes.

18    Q.   Could you keep your voice up louder.

19    A.   Sorry.

20    Q.   After you stopped the vehicle at 190th Street and

21    Linden Boulevard, did you begin an investigation?  Did

22    you get out of your car; what happened?

23    A.   Yes, we conducted a car stop, and at that point I

24    asked the driver for his license and registration and

25    just begin what I normally do for any car stop.

G.L.5

1    Q.    Aside from the driver, was there anybody else

2    inside of the vehicle?

3    A.    No.

4    Q.    After you requested that documentation, did the

5    driver provide you with all that documentation?

6    A.    Yes, he just provided me with a driver's license,

7    I believe.

8    Q.    During the investigation, did the driver tell you

9    where he was going?

10    A.    Yeah, he said he was headed home.

11    Q.    Did he tell you where his home was or?

12    A.    No.

13    Q.    Did you ask?

14    A.    I don't recall.

15    Q.    Aside from the driver license, what other

16    documentation did you request?

17    A.    Insurance and registration.

18    Q.    What kind of information would the registration

19    tell you?

20    A.    Just the make, model, the vehicle and the license

21    plate and vehicle identification number which is the VIN

22    number.

23    Q.    Did you make a -- and to be clear, did the driver

24    provide you with that information?

25    A.    No, he attempted to, but he didn't provide me

G.L.6

1    with the registration.

2    Q.  Did you -- did you make any determination whether

3    this car belonged to him?

4    A.  I asked him that I believe.

5    Q.  And during your investigation, did you request

6    that the driver step outside of the vehicle?

7    A.  Yes.

8    Q.  What was your purpose for doing that?

9    A.  Just officer safety.  So we had a lot of cars

10   take off on us.  It was just safer to continue the

11   traffic stop at that point, talk to him outside.

12   Q.  After you asked the driver to step outside of the

13   car, did you continue to have a conversation with him?

14   A.  Yes.

15   Q.  Where did that conversation take place?

16   A.  He was standing at the rear of his vehicle with

17   his butt to the bumper, the car facing me.  His back was

18   to the vehicle.

19   Q.  And during that interaction, did you observe

20   anything on the driver of the vehicle?

21   A.  Yes, I observed a bulge that was consistent with

22   a size and shape of a firearm on his left leg.  It was

23   like protruding out from where his knee cap was.

24   Q.  Could you describe what the bulge looked like?

25   A.  To me it looked like a -- consistent with the

G.L.7

1    size and shape of a firearm.

2        Q.    What kind of firearm and shape are you talking

3    about?

4        A.    Okay, some like kind of like L like, the slide

5    where it meets.  Where like this almost look like

6    downward sticking out.  Where normally someone jeans you

7    wouldn't see an object protruding out from their knee

8    cap.  It was about knee level on the inside.

9        Q.    The record would reflect you are indicating a L

10   shape with your hand.  Can you stand up and maybe show

11   for the jury where on the leg you saw the bulge?

12       A.    He was standing like this and he had jeans on

13   just about tight as mine, maybe a little tighter.  It

14   was sticking out like that basically.

15                MR. PILLER:  The record will reflect that

16            the officer is indicating the leg above the left

17            knee cap.

18       Q.    Did you ask or did any of the other officers ask

19   whether the driver -- let me rephrase that.

20            Did you or any of the officers ask the driver

21   whether he had any weapons on him or anything that he

22   wasn't suppose to have on him?

23       A.    Yes.

24       Q.    Did the driver respond or did the driver answer

25   that question?

G.L.8

```
 1      A.   I don't recall off the top of my head.  I think
 2  he said, no.
 3      Q.   After you observed the bulge, what did you do if
 4  anything?
 5      A.   I believe I asked him.  I said, what's going on
 6  with your jeans down there and he made a face.
 7  Basically, he looked down at the bulge I was asking him
 8  about.  I pointed.  I said, what's going on with your
 9  jeans down there, man.  He kind of did this and he --
10  then he looked up with kind of like a defeated look.  I
11  frisked the bulge and felt the firearm.
12      Q.   After you felt the firearm where the bulge was,
13  what happened next?
14      A.   I signalled to my partner I was working with that
15  day.  I said 92 which is a term for arrest.  When I said
16  92, when they hear that that means put the person in
17  handcuffs, he is under arrest at that point.
18      Q.   And was the driver arrested?
19      A.   Yes.
20      Q.   After he was arrested, was the object you felt
21  recovered?
22      A.   Yes.
23      Q.   What was -- what did you recover?
24      A.   It was a 380 firearm.  It was a Glock 42.
25      Q.   Was it loaded?
```

G.L.9

1      A.   Yes.

2      Q.   I'm approaching you with a picture that's marked

3  Grand Jury Exhibit Number 1.  I'm handing it to you.  Do

4  you recognize what I handed to you?

5      A.   Yes.

6      Q.   How do you recognize it?

7      A.   That's the gun from the night we are talking

8  about.

9      Q.   Is that the gun you recovered?

10     A.   Yes, that's the gun I recovered off the person.

11     Q.   Does that picture fairly and accurately reflect

12  the condition and the appearance of the guns that you

13  recovered as well as the ammunition?

14     A.   Yes.

15     Q.   Where was the ammunition located?

16     A.   It was -- there was, I believe, four rounds in

17  the magazine and one in the chamber of the firearm.

18          MR. PILLER:  We are moving and receiving

19          into evidence what is marked Grand Jury Exhibit

20          Number 1, and I'm going to publish it to the

21          Grand Jury.

22     Q.   Officer, did you learn the name of the person

23  that you arrested?

24     A.   Yes.

25     Q.   What was his name?

G.L.10

```
 1      A.   Koran Chambers.
 2      Q.   Is Koran Chambers the subject of this Grand Jury
 3   investigation?
 4      A.   Yes.
 5      Q.   And were you -- at this time during this car
 6   stop, were you wearing a body camera?
 7      A.   Yes.
 8      Q.   Was your body camera activated?
 9      A.   Yes.
10      Q.   And it was recording?
11      A.   Yes.
12      Q.   Does your body camera truly and accurately record
13   what is in front of the camera?
14      A.   Yes.
15      Q.   Does it truly and accurately record both video
16   and audio?
17      A.   Yes.
18      Q.   I'm approaching you with a white CD that's marked
19   Grand Jury Exhibit Number 2.  I'm handing it to you.  Do
20   you recognize what I have handed to you?
21      A.   Yes.
22      Q.   How do you recognize it?
23      A.   This is my body worn camera footage.
24      Q.   Have you reviewed that CD?
25      A.   Yes, in your office.
```

G.L.11

```
 1      Q.   Does that CD contain a true and accurate copy of
 2   approximately 24 minutes of your body camera recording?
 3      A.   Yes.
 4           MR. PILLER:   Removing and receiving into
 5           evidence Grand Jury Exhibit Number 2.
 6      Q.   Officer, was the firearm, the gun that you
 7   recovered, was that vouchered in this case?
 8      A.   Yes.
 9      Q.   What does it mean to voucher property?
10      A.   It's our department's way of itemizing,
11   accounting for property that's recovered during an
12   arrest or other situations, that our department
13   encounters.
14      Q.   In that vouchering process, is property assigned
15   an invoice number?
16      A.   Yes.
17      Q.   And is that a unique number relating to a
18   specific piece of property?  Was the firearm and
19   ammunition given an invoice number in this case?
20      A.   Yes.
21      Q.   Do you recall what that invoice number is?
22      A.   Not off the top of my head.
23      Q.   Would a copy of the property clerk's invoice
24   refresh your recollection?
25      A.   Yes.
```

G.L.12

```
 1        Q.   I'm handing you a copy of the property clerk's
 2   invoice.   Can you tell me when -- if your recollection
 3   has been refreshed?
 4        A.   Yes.
 5        Q.   Can you tell the jury what is the invoice number
 6   for the gun and ammunition?
 7        A.   Yes, it's Invoice Number 4000937358.
 8        Q.   And after you recovered the gun, was it sent to a
 9   -- do you know was it sent to a laboratory for testing;
10   whether the gun was operable?
11        A.   Yes.
12        Q.   Was it sent for testing?
13        A.   I'm not sure.   I put in a request for the testing
14   or lab.
15        Q.   You don't have personal knowledge it was sent,
16   that's typically what you do?
17        A.   Yes, I requested that it be sent.   I'm just not
18   sure if it was sent yet.
19        Q.   After you arrested Mr. Chambers, do you collect
20   personal information about someone who is arrested?
21        A.   Yes.
22        Q.   Such as name, date of birth, things like that?
23        A.   Yes.
24        Q.   And did you determine whether Mr. Chambers had a
25   New York State identification number or a NYSID number?
```

G.L.13

1    A.   Yes.

2    Q.   Did he have one?

3    A.   Yes.

4    Q.   And what is a NYSID number?

5    A.   When someone gets fingerprinted, basically give

6    them a number associated with that person.

7    Q.   That can be fingerprinted for things like a job

8    application, is that right?

9    A.   Yes.

10   Q.   Do you have a NYSID number?

11   A.   Yes.

12   Q.   Do I have a NYSID number?

13   A.   I'm sure, yes.

14   Q.   And to be clear, did you observe whether Mr.

15   Chambers did have a NYSID number?

16   A.   Yes.

17   Q.   Did he have one?

18   A.   Yes.

19   Q.   Do you recall what his NYSID number is?

20   A.   Not off the top of my head.

21   Q.   Would a copy of the arrest report refresh your

22   recollection?

23   A.   Yes.

24   Q.   Handing a copy of the arrest report, please let

25   us know when your recollection has been refreshed.

G.L.14

1    A.    Yes.

2    Q.    What is Mr. Chambers NYSID number?

3    A.    It is 190434K.

4    Q.    And what is his date of birth?

5    A.    Date of birth is 11/15/1988.

6    Q.    Did you eventually test the windows to determine

7    how much they were tinted?

8    A.    No -- yes.

9    Q.    Do you use any kind of device when you do that?

10    A.    Yes, we use a tint meter.

11    Q.    I'm approaching you with a picture that's marked

12    Grand Jury Exhibit Number 3.  Do you recognize what I'm

13    handing you?

14    A.    Yes.

15    Q.    How do you recognize it?

16    A.    This is a photo that I took of a tint meter

17    testing the vehicle that we are talking about, its

18    window tint.

19    Q.    Does that picture truly and accurately reflect

20    the tint meter of the red Jaguar vehicle that you tested

21    as well as the tint meter reading?

22    A.    Say that again.

23    Q.    Does that picture fairly and accurately depict

24    the car that we have been talking about, the red

25    Jaguar's window, and the tint meter as well as the

G.L.15

1    reading on the tint meter?

2        A.    Yes.

3                MR. PILLER:    Removing and receiving into

4            evidence Grand Jury Exhibit Number 3.

5        Q.    Can you tell us how does that tint meter work?

6    How do you read the tint meter?

7        A.    So it gives a light transmittance basically

8    saying how much light is allowed through and gives off

9    the number on there.    Basically, slide on the window to

10    get a reading how dark or how light the window tint

11    actually is.

12        Q.    What was the reading on the tint meter when you

13    tested it?

14        A.    Twenty-two.

15        Q.    Did you test all of the windows on the car?

16        A.    All but the driver window.

17        Q.    Did all the windows read 22?

18        A.    No, I think the other two might have read a

19    different number.

20        Q.    Do you recall what that number was?

21        A.    I think it was 26.    I have to check to be sure.

22        Q.    In the 20s?

23        A.    In the 20s, yes.

24        Q.    So the reading of 22 does that mean 22 percent of

25    light is able to pass through the window?

G.L.16

```
 1    A.   Yes.
 2              MR. PILLER:  At this time it's 12:55.  I
 3         think we are going to stop for lunch.  Officer,
 4         you can step down for now.
 5              JUROR:  He stated that he attempted to give
 6         him a registration; however, he did not receive
 7         one.  What does he mean by attempted, the
 8         officer?
 9              MR. PILLER:  So it's a question from the
10         witness.
11              JUROR:  Yes.
12              MR. PILLER:  So briefly, we'll continue this
13         witness's testimony later this afternoon.  So
14         hold your questions until the end and we'll ask
15         those questions when we return this afternoon.
16         Thank you.
17              For now we're breaking for lunch.  Officer,
18         will you step down first.
19              (WITNESS EXCUSED)
20
21              MR. PILLER:  At this time, we're going to
22         continue the case to later this afternoon.  Any
23         questions you have about -- questions you have
24         for the witness or any questions you have about
25         the law, you can ask those questions at the end.
```

G.L.17

1          For now we are going to break.  In the meantime,
2      please do not discuss or deliberate on this case
3      until I have had an opportunity to present
4      additional evidence and charge you on the law.
5          Thank you.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

J.P.20

```
 1                POLICE OFFICER JOSEPH KEEGAN,
 2   was recalled as a witness, having previously been duly
 3   sworn, testified further as follows:
 4   BY MR. PILLER:
 5                MR. PILLER:  Madam Foreperson, would you
 6           please remind the witness he is still under oath.
 7                FOREPERSON:  Officer, you are still under
 8           oath.
 9                MR. PILLER: You are under the same oath
10           that you took earlier this afternoon.
11                THE WITNESS:  Yes.
12   Q.   Officer, I want to direct your attention back to
13   the incident you testified about earlier on October 19,
14   2022, between 8:45 p.m. and 9:04 p.m. in Queens County.
15   After you arrested Koran Chambers, was an arrest number
16   assigned to that arrest?
17   A.   Yes.
18   Q.   Do you recall what that arrest number was?
19   A.   Not off the top of my head.
20   Q.   Would a copy of the complaint refresh your
21   recollection of the arrest number?
22   A.   Yes.
23   Q.   Handing you a copy of the complainant, please let
24   me know when your recollection has been refreshed.
25   A.   Yes.
```

J.P.21

1  Q.   What is the arrest number in this case?

2  A.   It is Q22633436.

3         MR. PILLER:   I am holding in my hand a

4  one-page document that I have marked as Grand

5  Jury Exhibit Number 4.   Reading from the

6  document:   New York City Police Department Police

7  Laboratory Firearms Analysis Laboratory Report.

8  Invoice number 4000937358.   Defendant Koran

9  Chambers.   At the bottom there is a

10  certification:   I hereby certify that I

11  tested/examined/analyzed the above described

12  items and that this report is an original report

13  made by me. False statements made herein are

14  punishable as a Class A misdemeanor pursuant to

15  Section 210.45 of the New York State Penal Law.

16  It is signed by Officer Didonato.   Tax number

17  948888.   Date prepared October 24, 2022.

18         We are moving and receiving into evidence

19  Grand Jury Exhibit Number 4.   Reading from the

20  document in pertinent part:   Type of analysis:

21  Firearms examination.   Invoice item one, pistol

22  380 auto caliber semi-automatic Glock model 42.

23  Item number two, case cartridge 380 auto caliber

24  Winchester jacketed hollow point.   Item three,

25  magazine 380 caliber auto caliber, capacity 6.

J.P.22

```
 1          Invoice item number four, case cartridge 380
 2          caliber Winchester jacketed hollow point.
 3          Results of examination/analysis:  Pistol was test
 4          fired utilizing submitted and laboratory
 5          ammunition.  Pistol and the utilized submitted
 6          ammunition were found be operable.
 7              I am holding a one-page document marked as
 8          Grand Jury Exhibit Number 5.  It is a fingerprint
 9          analysis.  There is a certification at the
10          bottom:  This report consists of one page.   It
11          is hereby certified that it is a true and
12          unaltered copy transmitted and certified by
13          Kimberly Tomlinson.
14              Moving and receiving into evidence Grand
15          Jury Exhibit Number 5.  Reading from the
16          document:
17              I hereby certify that I am employed by the
18          New York State Division of Criminal Justice
19          Services, the Division, and that I am a public
20          servant, Identification Specialist II, charged
21          with the custody of official fingerprint records,
22          in that I am assigned to the State Identification
23          Bureau, which serves as the State's central
24          repository of fingerprint cards and criminal
25          history records.
```

J.P.23

```
 1                I further certify that the fingerprint
 2        impressions recorded on the arrest fingerprint
 3        card maintained by the Division, bearing the
 4        following information:
 5                NAME: CHAMBERS, KORAN.
 6                NYSID: 00190434K.
 7                DATE OF ARREST: 10/19/22.
 8                ARREST NUMBER: Q22633436.
 9                Were compared by me with the fingerprint
10        impressions recorded on the arrest fingerprint
11        card maintained by the Division, bearing the
12        following information:
13                NAME: CHAMBERS, KORAN.
14                NYSID: 00190434k.
15                DATE OF ARREST: 4/18/13.
16                ARREST NUMBER: Q13623021.
17                I determined from my comparison of the
18        fingerprint impressions, recorded on the above
19        arrest fingerprint cards, that the fingerprint
20        impressions are those of the same individual.
21                There is the signature of Kimberly M.
22        Tomlinson, Identification Specialist II.  Dated
23        October 25, 2022.
24                I am holding in my hand a two-page document
25        marked as Grand Jury Exhibit Number 6.  It is a
```

J.P.24

```
 1           Certificate of Disposition.  There is a
 2           certification:  I hereby certify that it appears
 3           from an examination of the records on file in
 4           this office that on January 9, 2014, the
 5           above-named defendant was convicted of the crimes
 6           below.  At the bottom it states in witness
 7           whereof, I have hereunto set my hand and affixed
 8           my officia seal on this date, October 24, 2022.
 9           There is the signature of the court clerk with
10           the raised seal of the court.
11                We are moving and receiving into evidence
12           Grand Jury Exhibit Number 6.  Reading from the
13           document in pertinent part:  The People of the
14           State of New York versus Koran Chambers,
15           Defendant.  NYSID number 190434K. Arrest number
16           Q13623021.  Date of arrest April 18, 2013.  Date
17           of birth November 15, 1988.
18                That on February 21, 2014, upon the
19           aforesaid conviction by plea, to Attempted
20           Burglary in the Second Degree, under Penal Law
21           Section 110/140.25-2 the judge sentenced the
22           defendant and sentence was imposed.
23      Q.   Officer, I would like to follow up on your
24      testimony from earlier about the registration.  We had a
25      question from a Grand Juror before we took a break for
```

J.P.25

1    lunch.  When you asked the driver of the vehicle for

2    registration, did they show you any paper registration?

3        A.  No.

4        Q.  And did they indicate that their registration was

5    electronic, where they had an electronic copy?

6        A.  He was trying to show me his electronic copy for

7    his insurance card.

8        Q.  Did you see the registration that he was in the

9    process of showing you?

10       A.  He told me it was on the windshield.

11       Q.  Did he pull up anything on his phone?

12       A.  Not in regards to the registration.

13       Q.  Did he pull up anything on his phone in regards

14   to something else?

15       A.  He was trying to get his insurance up, but I

16   didn't look at it.

17       Q.  Did you charge him with not having registration?

18       A.  No.

19           MR. PILLER:  At this point we are going to

20           publish Grand Jury Exhibit Number 2.  I am

21           putting Grand Jury Exhibit Number 2 into the

22           computer.  I am going to play the file called BWC

23           Keegan.  I have opened the file.

24       Q.  Officer, would you step down for a moment or can

25   you see the screen from there?  Can you see the time

J.P.26

1    stamp?

2        A.  Yes.

3        Q.  On the top right corner there is a date and time

4    stamp for October 19, 2022, at 20:44.  Does that date

5    and time stamp accurately reflect the date and time of

6    this recording?

7        A.  Yes.

8        Q.  And 20:44, would that be 8:44 p.m.?

9        A.  Yes.

10            MR. PILLER: I am going to skip ahead to

11            20:45:27.

12

13            (WHEREUPON, A VIDEO WAS PLAYED FOR THE

14            MEMBERS OF THE GRAND JURY.)

15

16            MR. PILLER:  I am pausing the video at

17            20:46:37.

18        Q.  Officer, was there any license plate on the front

19    of this vehicle that you stopped?

20        A.  No.

21        Q.  Was there any plate on the rear of the vehicle?

22        A.  Yes.

23            MR. PILLER:  I am going to skip ahead in the

24            in video to 20:59:45.

25

J.P.27

```
1              (WHEREUPON, A VIDEO WAS PLAYED FOR THE
2         MEMBERS OF THE GRAND JURY.)

3

4    Q.   Officer, at this point in this video, do you
5  recall what, if anything, you were doing?
6    A.   Yes. At this point I was running the defendant's
7  Client ID number.
8    Q.   What is a Client ID number?
9    A.   That is the number associated with your driver's
10  license, or if you don't have a driver's license, it
11  gets generated if you were written a ticket or anything
12  like that.
13   Q.   With respect to this investigation, what kind of
14  information were you looking for based on the driver's
15  Client ID number?
16   A.   Just to see if he had a suspended license or if
17  his license was good basically at that point.
18   Q.   Did you get any information when you made that
19  inquiry or that search with the Client ID?
20   A.   At that point no, it wasn't loading for me on my
21  phone.
22   Q.   Was there a problem with the technology?
23   A.   Yes, I believe so.
24             MR. PILLER:   I am going to resume the video.
25
```



AFFI1016655 1012221

Q22633436

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR, COUNTY OF QUEENS

THE PEOPLE OF THE STATE OF NEW YORK |
                                      |        STATE OF NEW YORK
              V.                      |        COUNTY OF QUEENS
                                      |
  KORAN CHAMBERS (33Y)                |
      00190434K                       |
                          DEFENDANT|
                                      |



CR-026148-22QN

POLICE OFFICER JOSEPH KEEGAN OF PBQS ANTI-CRIME UNIT, TAX REG#: 960749,
BEING DULY SWORN, DEPOSES AND SAYS THAT ON OR ABOUT OCTOBER 19 2022
BETWEEN 8:45PM AND 9:04PM, AT THE INTERSECTION OF 190 STREET AND LINDEN
BOULEVARD, COUNTY OF QUEENS, STATE OF NEW YORK, THE DEFENDANT COMMITTED
THE OFFENSES OF:

PL 265.03 (1) (B) (EFF 12/15/2006) [CF] CRIMINAL POSSESSION OF A
     WEAPON IN THE SECOND DEGREE - AN ARMED FELONY OFFENSE
PL 265.03 (3)  (12/15/2006) [CF] CRIMINAL POSSESSION OF A WEAPON IN
     THE SECOND DEGREE - AN ARMED FELONY OFFENSE
PL 265.01-B-1 (EFF. 3/16/2013) [EF] CRIMINAL POSSESSION OF A FIREARM
     (EFF. 3/16/2013
VTL 375-12-A (B)(1)   (WINDOW TINT) [V] EQUIPMENT OF MOTOR VEHICLES
     AND MOTORCYCLES
VTL 402-1 [V] ISSUANCE, NUMBER, LOCATION AND CONDITION OF VEHICLE
     PLATES

_____

PL 265.03 (1) (B) (EFF 12/15/2006) [CF] CRIMINAL POSSESSION OF A WEAPON
IN THE SECOND DEGREE - AN ARMED FELONY OFFENSE
     --- WITH INTENT TO USE THE SAME UNLAWFULLY AGAINST ANOTHER,
     POSSESS A LOADED FIREARM;

PL 265.03 (3)  (12/15/2006) [CF] CRIMINAL POSSESSION OF A WEAPON IN THE
SECOND DEGREE - AN ARMED FELONY OFFENSE
     --- POSSESS ANY LOADED FIREARM.  SUCH POSSESSION SHALL NOT,
     EXCEPT AS PROVIDED IN SUBDIVISION ONE OR SEVEN OF SECTION 265.02
     OF THIS ARTICLE CONSTITUTE A VIOLATION OF THIS SUBDIVISION IF
     SUCH POSSESSION TAKES PLACE IN SUCH PERSON'S HOME OR PLACE OF
     BUSINESS;

PL 265.01-B-1 (EFF. 3/16/2013) [EF] CRIMINAL POSSESSION OF A FIREARM
(EFF. 3/16/2013
     --- POSSESS ANY FIREARM;

VTL 375-12-A (B)(1)   (WINDOW TINT) [V] EQUIPMENT OF MOTOR VEHICLES AND
MOTORCYCLES





AFFH1016655J1012221

CHAMBERS,KORAN  Q22633436

    --- OPERATE A MOTOR VEHICLE UNPON ANY PUBLIC HIGHWAY, ROAD OR
STREET (1)  AND THE FRONT WINDSHIELD OF WHICH WAS COMPOSED OF,
COVRERED BY OR TREATED WITH ANY MATERIAL WHICH HAS A LIGHT
TRANSMITTANCE OF LESS THAN SEVENTY PERCENT UNLESS SUCH MATERIALS
ARE LIMITED TO THE UPPERMOST SIX INCHES OF THE WINDSHIELD OR (2)
THE SIDEWINGS OR SIDE WINDOWS OF WHICH ON EITHER SIDE FORWARD OF
OR ADJACENT TO THE OPERATOR'S SEAT ARE COMPOSED OF, COVERED BY OR
TREATED WITH ANY MATERIAL WHICH HAS A LIGHT TRANSMITTANCE OF LESS
THAN SEVENTY PERCENT OR (3) IF IT IS CLASSIFIED AS A STATION
WAGON , SEDAN, HARDTOP, COUPE, HATCHBACK OR CONVERTIBLE AND ANY
REAR SIDE WINDOW HAS A LIGHT TRANSMITTANCE OF LESS THAN SEVENTY
PERCENT OR (4) THE REAR WINDOW OF WHICH IS COMPOSED OF, COVERED
BY OR TREATED WITH ANY MATERIAL WHICH HAS A LIGHT TRANSMITTANCE
OF LESS THAN SEVENTY PERCENT (A REAR WINDOW MAY HAVE A LIGHT
TRANSMITTANCE OF LESS THAN SEVENTY PERCENT  IF THE VEHICLE IS
EQUIPPED WITH SIDE MIRRORS ON BOTH SIDES OF THE VEHICLE SO
ADJUSTED THAT THE DRIVER THEREOF SHALL HAVE A CLEAR AND FULL VIEW
OF THE ROAD AND CONDITION OF TRAFFIC BEHIND SUCH VEHICLE);

VTL 402-1 [V] ISSUANCE, NUMBER, LOCATION AND CONDITION OF VEHICLE
PLATES
    --- OPERATE, DRIVE OR PARK UPON THE STATE'S PUBLIC HIGHWAYS A
MOTOR VEHICLE WITHOUT A DISTINCTIVE NUMBER AND A SET OF NUMBER
PLATES WITH A NUMBER AND OTHER IDENTIFICATION MATTER
CORRESPONDING TO THE CERTIFICATE OF REGISTRATION CONSPICUOUSLY
DISPLAYED, ONE ON THE FRONT AND ONE ON THE REAR OF SUCH VEHICLE,
SECURELY FASTENED AND PLACED HIGHER THAN FORTY-EIGHT INCHES OR
LOWER THAN TWELVE INCHES FROM THE GROUND.


THE ABOVE OFFENSES WERE COMMITTED AS FOLLOWS:

DEPONENT STATES THAT AT THE ABOVE MENTIONED DATE, TIME, AND PLACE OF
OCCURRENCE HE OBSERVED THE DEFENDANT, KORAN CHAMBERS, DRIVING A 2011 RED
JAGUAR WITH EXCESSIVE WINDOW TINTS, AND ONLY A REAR NEW YORK STATE
LICENSE PLATE AND NO FRONT LICENSE PLATE.

DEPONENT FURTHER STATES THAT AN EXAMINATION OF THE FRONT PASSENGER
WINDOW WITH A TINT METER SHOWED THAT SAID WINDOW HAD A LIGHT
TRANSMITTANCE OF ONLY TWENTY-SIX PERCENT (26%) WHICH IS BELOW THE
LEGAL LIMIT OF SEVENTY PERCENT (70%).

DEPONENT FURTHER STATES THAT HE ASKED THE DEFENDANT TO STEP OUT OF THE
ABOVE MENTIONED MOTOR VEHICLE AND THEN HE OBSERVED A BULGE THAT APPEARED
TO BE A FIREARM IN THE DEFENDANT'S PANTS.

DEPONENT FURTHER STATES THAT HE FELT AND RECOVERED A .380 CALIBER PISTOL
FROM THE DEFENDANT'S PANTS.

DEPONENT FURTHER STATES THAT THE ABOVE MENTIONED PISTOL CONTAINED ONE
(1) ROUND OF .380 CALIBER AMMUNITION IN THE CHAMBER AND FOUR (4)
ROUNDS OF .380 CALIBER AMMUNITION IN THE MAGAZINE.



AFFI|I01665S|I01222I

CHAMBERS,KORAN  Q22633436

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE
PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT
TO SECTION 210.45 OF THE PENAL LAW

10/20/22    Po Keng
DATE        SIGNATURE

SWORN TO BEFORE ME ON THE
DAY OF

_____
DATE        SIGNATURE

**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DEVISION: SECOND DEPARTMENT**
-----------------------------------------------------------------------

In the Matter of the Application of Koran Chambers,
For Relief Pursuant to Article 78 of the CPLR,
Petitioner,

-against-

Hon. David J. Kirschner, Justice, Queens
County Criminal Supreme Court, and Melinda
Katz, Queens County District Attorney,
Respondents.
-----------------------------------------------------------------------

Appellate Docket No. 2025-05020
-----------------------------------------------------------------------

Queens Supreme Court
Ind. No. 73253/22
=======================================

**APPLICATION FOR RECONSIDERATION**
**EN BANC OF ORDER TO SHOW CAUSE**
**WITH TRO**
=======================================

Koran Chambers
Petitioner *pro se*
104-09 189th Street
Saint Albans, NY 11412
Phone: (718) 926-3606